Vernon HENDERSON, Appellant,

v.

DISTRICT OF COLUMBIA, et
al., Appellees.

DISTRICT OF COLUMBIA, et
al., Appellants,

v.

Vernon HENDERSON, Appellee.

Nos. 83–603, 84–220, 83–610 and 84–202.

District of Columbia Court of Appeals.

Argued March 20, 1985.

Decided May 31, 1985.

Geraldine R. Gennet and Nicholas S. McConnell, Washington, D.C., for Henderson.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for District of Columbia, et al.

Before PRYOR, Chief Judge, and NEWMAN and TERRY, Associate Judges.

NEWMAN, Associate Judge:

This case presents a saga of what may be called—to paraphrase Winston Leonard Spencer Churchill—less than "the finest hour" of the Metropolitan Police Department (MPD) of this city. MPD received information from a citizen which caused them to suspect that Henderson, a police officer then with nine years on the force, was a thief. The matter was ultimately referred to the Internal Affairs Division of the Police Department (IAD) which investigated the matter. After completing its investigation, IAD decided that the results were inconclusive. With the approval of ranking police officials, including the then Chief of Police, Burtell M. Jefferson, they devised a plan, either to "catch a thief" or to vindicate Henderson. It is from Henderson's arrest pursuant to this plan, and subsequent actions and inactions, that this lawsuit arises.

Henderson sued the District of Columbia and six police officials in their individual and official capacities—the then Chief of Police Burtell M. Jefferson, Assistant Chief Marty M. Tapscott, Inspector Horatius W. Wilson, Lt. John C. Daniels, Sgt. James E. Gaines and Sgt. Roger Arnold (the latter four at times relevant hereto being assigned to IAD). Henderson sought both compensatory and punitive damages, as well as equitable relief for false arrest, malicious prosecution, defamation and violation of various of his constitutional rights. As to the latter, he invoked the trial court's jurisdiction under the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1982), as amended (§ 1983).[1] Judgment was en-

---

1. *See Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). *See also*

tered on a jury verdict in his favor against all defendants for compensatory damages for false arrest, malicious prosecution, defamation, the § 1983 claims, and for punitive damages against each of the individual defendants, including Chief Maurice Turner, who had been added as a defendant.[2] In a post-trial hearing, the court granted equitable relief to Henderson as well as attorneys' fees and costs pursuant to The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1982), as amended (§ 1988).

In these consolidated cross-appeals, Henderson seeks reversal of the trial court's rulings with respect to back pay, benefits, and the quantum of attorneys' fees while all defendants seek reversal of the judgments against them in their totality. The defendants (hereafter sometimes referred to as the District of Columbia, et al.) challenge a pre-trial order by Judge Braman imposing sanctions against them for failure to respond to discovery. They also challenge various actions of Judge Bacon, including: (1) failing to rule that probable cause for Henderson's arrest and prosecution existed as a matter of law; (2) failing to rule that as a matter of law, no § 1983 violation was shown; (3) failing to rule that the individual defendants have an absolute immunity for the alleged common law torts; and (4) the attorneys' fee award. We affirm the award of compensatory and punitive damages as well as the equitable relief granted. We hold that the trial court erred in its ruling on back pay, benefits, and with respect to its evaluation of certain factors it considered in reducing the attorneys' fee award. We remand for further proceedings on these three issues.

*Maine v. Thiboutot,* 448 U.S. 1, 10–11, 100 S.Ct. 2502, 2507–08, 65 L.Ed.2d 555 (1980).

2. By operation of law, Maurice Turner was substituted as a defendant for Chief Burtell Jefferson when Turner became Chief of Police on July 15, 1981. Super.Ct.Civ.R. 25(d)(1). *See also Monell v. Department of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611 (1978). By an amended

## I

### Facts

In March of 1979, Ms. Boone, a resident of the District of Columbia, contacted Third District Headquarters of the MPD (3 D) inquiring about a lady's handbag she said had been found by her sons the previous day on Georgia Avenue, N.W., in the vicinity of Howard University; Ms. Boone stated that the handbag had been turned over to a member of MPD.[3] After searching the property records at 3 D and finding no report of such a handbag being turned in by any police officer, a lieutenant contacted Ms. Boone. She reported that her sons gave the handbag to a black police officer who was in scout car 129. Further investigation disclosed that scout car 129 operated from the Fourth District (4 D) and, at the relevant times, was assigned to Henderson, who is black, and his partner, who is white. The matter was then referred to 4 D for further investigation.

4 D officials, including Lt. Michael Elmore, Henderson's supervisor, conducted further investigation. This investigation was at best inconclusive. Indeed it developed significant reasons to discount the account of Ms. Boone and her sons as to the identity of the officer to whom they stated they turned over the handbag. When questioned, Henderson denied the allegations. Concluding that some other police officer, either of MPD or some other police force in the city, might be the culprit, Lt. Elmore consulted with Deputy Chief Troublefield, and they decided to refer the matter to IAD. At IAD, the case was assigned to Sgt. Gaines and his partner, Sgt. Arnold, who conducted a further investigation. The results of this investigation were inconclusive, to say the least.

complaint filed January 8, 1982, Turner was added as a defendant in his individual capacity relating to his decision not to give Henderson back pay upon reinstatement.

3. Ms. Boone was apparently seeking to determine whether any reward would be forthcoming.

IAD decided to pursue the matter further by planting a lady's handbag containing money, having Henderson recover it, and seeing if he would turn in the bag and its contents according to MPD regulations.

On December 19, 1979, with the approval and direction of Inspector Wilson and Lt. Daniels, as well as Chief Jefferson, IAD officers put $106 in currency, which had been sprayed with "thief powder," 43 cents, and other items, including a driver's license, into a lady's handbag (the currency was placed in a wallet which was placed in the handbag) and placed it under a bush in the 4600 block of 16th Street, N.W. IAD set up surveillance of the scene and had the police dispatcher assign Henderson to recover the handbag. Henderson retrieved the bag and radioed for identification of the complainant and for report numbers. He returned to 4 D and began preparing his report. He ran the driver's license through the computer, completed his reports, and logged the handbag and its contents, minus the money, on the property book; he then placed the purse and its contents in the locked property room. IAD checked the property book and signaled Sgts. Gaines, Arnold, and others, who were outside the building, that the money had not been recorded on the property book at the end of Henderson's shift. Henderson left the building at the end of his shift, immediately turned and went back inside where he conversed with Officer Paulette Johnson and Detective William Wood for approximately 10 minutes. At the conclusion of these conversations, Henderson again left the building, going to his car in the parking lot. He was arrested, accused of grand larceny, and searched. The $106 was not in Henderson's possession although the 43 cents was. Henderson was detained outside 4 D in full view of his colleagues for approximately forty-five minutes. During that time, after verifying that none of the currency seized from Henderson matched the serial numbers of the "bait" money, Sgt. Gaines conferred with other IAD officials,

including Lt. Daniels and Sgt. Arnold, and reported developments. Finally, Sgt. Gaines decided to search the handbag in the property room. He found the $106 in currency in the wallet with all the bills face up with the serial numbers in the lower left, exactly as they had been placed by him originally. Sgt. Gaines testified he believed that Henderson saw the IAD officers when he first left the building, went back inside and put the $106 back into the wallet in the handbag. However, Henderson's hands were not examined for "thief powder" at this time. Later examination found them free of "thief powder."

After this discovery and while still under arrest, Henderson was transported to police headquarters where he was booked for grand larceny; he was held in the central cell block for several hours while his family sought a bondsman to post the required surety bond. At the direction of Inspector Wilson, Sgt. Gaines revoked Henderson's police powers and placed him on administrative leave.

Sgt. Gaines prepared, and later filed, a PD 251 incident report,[4] which Lt. Daniels reviewed and approved, which described Henderson's arrest and stated in part that Henderson "had been found to be in possession of $106.43 in violation of D.C.Code Title 22–2201" (the code section pertaining to grand larceny). Thereafter, Sgts. Gaines and Arnold presented the matter to two Assistant United States Attorneys, representing that Henderson had in fact stolen the $106.43. As a consequence, a complaint was filed by the United States Attorney in the Superior Court charging Henderson with grand larceny, a felony.

By memorandum dated December 20, 1979, Inspector Wilson requested that Chief Jefferson suspend Henderson indefinitely without pay. This recommendation was approved on December 21, 1979, by Asst. Chief Tapscott, as Acting Chief. The Personnel Office of MPD, by letter dated January 3, 1980, notified Henderson of the proposal to suspend him indefinitely with-

---

4. A PD 251 is a public record available to any member of the public who is interested therein.

out pay based on the events of December 19, 1979, and of his right to reply and to review certain materials before a final decision on indefinite suspension without pay.[5] Henderson appeared before Tapscott on January 11, 1980, for a hearing on the proposed suspension. Henderson informed Tapscott that the evidence showed conclusively that he had never touched the $106 and that the criminal complaint had been dismissed based on a finding of no probable cause at a preliminary hearing held pursuant to Super.Ct.Crim.R. 5(d) before Judge Shellie Bowers on January 7, 1980. Nevertheless, Asst. Chief Tapscott recommended to Chief Jefferson that Henderson be suspended indefinitely without pay; Jefferson did so effective January 30, 1980.

In the meantime, one or more members of IAD who are the defendants here informed the media of the arrest of Henderson for stealing $106; Jim Vance, a local newscaster, reported this on WRC–TV on December 20, 1979.

After the preliminary hearing and in face of Judge Bowers' ruling of no probable cause, Inspector Wilson, Lt. Daniels and Sgts. Gaines and Arnold unsuccessfully sought to get the United States Attorney to present the matter to a grand jury. By memorandum dated April 24, 1980, the United States Attorney informed Sgt. Gaines that he was not going to proceed further with the matter.

The attorney then representing Henderson (Barry Stiller) twice wrote letters to Chief Jefferson demanding that Henderson be reinstated with back pay and other relief. Chief Turner (then an Asst. Chief), acting for Chief Jefferson, responded to the first letter, and Jefferson personally responded to the second; both denied the relief demanded. The first response, dated June 27, 1980, alluded to "the distinct possibility that administrative charges" would be brought against Henderson. The second response, dated November 14, 1980, stated that Henderson "will appear before a Police Trial Board on charges which could result in his being removed from the force, if convicted."

Henderson filed suit in the Superior Court on December 17, 1980, two days short of one year from the date of his arrest. Four months later—by memorandum dated April 22, 1981—for the first time, Henderson was informed of the charges and specifications lodged against him and then being referred to the Police Trial Board for trial.[6] In a ruling dated July 27, 1981, the trial board found Henderson guilty of two minor offenses—failure to promptly and properly list and surrender the 43 cents. They recommended that Henderson be fined $450. Chief Turner, who had by then succeeded Burtell Jefferson, directed that Henderson be reinstated effective July 28, 1981.

Henderson's counsel (Geraldine Gennet) wrote Chief Turner formally demanding back pay and benefits pursuant to the Mayor's Memorandum No. 81–53 (July 17, 1981) (providing for back pay for certain unwarranted personnel action). She also formally demanded that Henderson be promoted to the grade of Master Patrol Officer, retroactive to the date of his arrest; such a promotion had been approved prior to his arrest. By letter dated August 13, 1981, Henderson was informed that he had been awarded back pay and benefits in the grade of Officer. He had not long to savor even this limited success, for by letter dated August 20, 1981, he was advised that since back pay was an issue in the suit he had filed, a final decision on that issue would be

---

5. The parties agree that Henderson was a career service employee and could be suspended without pay or terminated only for cause.

6. There were four charges and specifications. In essence they charged Henderson with: receiving the handbag containing in excess of $100.00 currency from the Boone brothers as well as the handbag planted by IAD containing the $106.43 "bait" money; failing to properly list the handbags and their contents on the property books; stealing the money contained in the handbag obtained from the Boone brothers; lying to superiors orally and in writing about the incidents.

held in abeyance pending advice from the Corporation Counsel. Finally, by letter dated September 16, 1981, Chief Turner denied back pay. This letter failed to inform Henderson that he had a right of appeal or of the means to make such an appeal. When Henderson sought review of this decision before the Office of Employee Appeals (OEA), the Corporation Counsel contended OEA lacked jurisdiction while at the same time the Corporation Counsel was seeking a stay of Henderson's civil suit on the grounds that he had failed to exhaust his administrative remedies.

For the most part, the foregoing facts were not disputed at trial.

## II

### Pretrial Proceedings

The defendants answered the complaint by a consolidated answer filed in January 1981 (all individual defendants having elected to be represented by the Corporation Counsel). On February 20, 1981, Henderson filed a Request for Production of Documents and Things as well as Interrogatories, both addressed to all the defendants. A status hearing was held before Judge Braman on March 3, 1981. Judge Braman ordered, *inter alia*, that discovery was to be completed by August 21, 1981; all motions were to be filed by August 28, 1981, and trial was scheduled for September.8, 1981. On March 24, 1981, the defendants moved for an extension of time in which to respond to discovery and also filed objection to certain of Henderson's interrogatories and request for production. By order dated April 8, 1981, Judge Braman granted the extension of time sought by the defendants and directed that they respond to discovery by April 24, 1981. On May 6, 1981, Henderson moved to compel discovery, accompanying the motion with a certificate of attempts to obtain compliance informally. In that certificate, Ms. Gennet certified that she had made several bona fide attempts to obtain responses, all to no avail. She stated that on May 1, 1981, she had spoken to counsel for the defendants who

had informed her that he had not received the necessary data from his clients and that he had no idea when responses would be forthcoming. On May 21, 1981, Henderson moved for an extension of time to file his list of expert witnesses. The motion recited that counsel for the defendants had been told that the extension was being requested because of the defendants' failure to respond to discovery; it stated that counsel for the defendants did not object to the extension. The motion also sought a further order compelling the same discovery covered by the April 8 order, which order had granted the defendants an extension until April 24 to respond to discovery requests; it also sought sanctions. The defendants filed neither opposition to this motion nor request for a further extension of time in which to respond to discovery. By order filed on May 22, 1981, Judge Braman found that defendants were guilty of "aggravated derelictions in responding to discovery request and spurning of the court rules ... [which] ... cannot be tolerated." He applied the following sanctions under Super.Ct.Civ.R. 37(b)(2)(A) after ruling that monetary sanctions against the District of Columbia were "inappropriate for a number of reasons":

> Ordered: that the averments set forth in the following paragraphs of the Complaint shall be taken to be established for the purpose of this action: Paragraphs 12, 13, 15 (without conceding that the accusation of grand larceny was false), 16, 17 (without admitting that the police report was false), 18 (without admitting that the representations were false), 19 (without admitting the falsity of the charges) and 20.

No motion to reconsider this ruling was ever filed, and no answers to discovery were forthcoming thereafter until partial replies were filed by some of the defendants on July 17, 1981.

Plaintiff's difficulty with obtaining discovery from the defendants continued in a like manner thereafter. These problems necessitated continuances of scheduled

dates, including trial dates. The difficulties included deposition sites, dates, nonappearance of party deponents; failure to answer interrogatories; and failure to produce documents and things. These further difficulties resulted in plaintiff obtaining enforcement orders from Judge Carlisle Pratt (acting in the absence of the assigned judge) as well as Judge Bacon. In her order filed on January 28, 1982, finding that the "[d]efendants have frustrated legitimate, timely discovery" and that defendants "present no circumstances which justify the delay in responding," Judge Bacon held that costs were "an appropriate sanction against the individual defendants." Costs in the sum of $563.20 were assessed against the individual defendants, pro rata, by order filed March 2, 1982. This order further provided that if these costs were not paid within 30 days, the individual defendants would be deemed to be in contempt of court and further sanctions would be imposed. After further pre-trial proceedings which need not be detailed here, the case finally proceeded to trial.

### III

### *Trial, Verdict and Post-Trial Proceedings*

The trial court submitted the case to the jury on special verdict. First, the jury was asked to determine liability for four claims against all defendants—for false arrest, malicious prosecution, defamation and the claim of constitutional violations under § 1983.[7] They were also asked to determine whether Henderson had proven his entitlement to back pay. This latter question called for the jury to check a "yes" block or a "no" block.[8] If the jury found for Henderson on any of these claims, they were asked to determine the amount of compensatory damages to which Hender-

son was entitled. The question read: "If you find that any defendants are liable to plaintiff in parts A. B. C. D. or E." (the five claims for damages set forth above), "set forth the dollar amount which will compensate plaintiff for the injuries which he sustained. $_____". The last question put to the jury was the question of punitive damages against the individual defendants. The jury found for Henderson against all defendants on all four of his claims for compensatory damages as well as finding for him on his claim for back pay. They filled in the blank for compensatory damages "$30,000 plus court costs." Further, the jury awarded punitive damages in the sum of $100.00 each against Sgts. Gaines and Arnold, and Lt. Daniels and in the sum of $200 each against Inspector Wilson, Asst. Chief Tapscott, former Chief Jefferson and Chief Turner. Judgment was entered on that verdict by order dated the same day the verdict was received (April 2, 1982).

On April 12, Henderson filed a motion to correct the judgment or for a new trial on damages only. He submitted affidavits from all of the jurors who averred that they understood that when they answered "yes" to the back pay question and then awarded $30,000 plus court costs, Henderson would receive the $30,000 *plus* his back pay.

An "equitable relief" hearing was held on April 14, 1982. Henderson sought a ruling on his motion to amend the judgment to add the amount of back pay to which the court determined him entitled, benefits, retroactive promotion to the grade of Master Patrol Officer effective the date of his arrest as well as expungement of arrest records. The court took the matters under advisement. On March 30, 1983, in open court, Judge Bacon entered written orders: 1) denying the motion of the Dis-

---

7. The court had previously ruled that Henderson was only entitled to recover one sum of damages no matter on how many of these four stated causes of action he prevailed. This ruling is not challenged on appeal.

8. The defendants objected to this issue going to the jury on the ground that it was properly reserved to the court as equitable relief. The court had so ruled on the issue of retroactive promotion.

trict of Columbia et al. for judgment notwithstanding the verdict or for a new trial; 2) denying Henderson's motion to correct the judgment or for a new trial on damages only; 3) granting expungement (based on a finding that Henderson had established by clear and convincing evidence that he did not commit any crime in the December 19, 1979 incident), citing our two en banc decisions of the same name in *District of Columbia v. Hudson,* 404 A.2d 175 (D.C. 1979), and 449 A.2d 294 (D.C.1982); 4) holding that the issue relating to benefits (back annual and sick leave) had been submitted to the jury since the jury had been told to compensate Henderson for all the damages to which they determine him to be entitled; and 5) directing that Henderson be promoted to Master Patrolman retroactive to December 17, 1979.

On January 26, 1983, while awaiting a ruling of the court on the matters it had taken under advisement on April 14, 1982, Henderson moved for an award of attorney's fees, costs and expenses pursuant to § 1988. The motion was accompanied by an affidavit of Ms. Gennett, lead counsel, by detailed time records, and affidavits of co-counsel as well as affidavits of three lawyers experienced in the field of civil rights litigation.[9] The motion sought an award of approximately $177,000. On January 31, 1984, the trial court issued a Memorandum Opinion awarding approximately $76,000 in fees and costs. The trial court stayed the judgment against the District of Columbia pending appeal. This court granted a similar stay to the individual defendants.

## IV

### *Discovery Sanctions*

■ Pursuant to Super.Ct.Civ.R. 37, the trial court has discretion to impose a range of sanctions for failure to provide discovery; among these is an order deeming certain facts admitted.[10] This is the sanction which the trial court explicitly imposed in this case. Our review of such a decision is limited to determining whether there has been an abuse of discretion. *Braxton v. Howard University,* 472 A.2d 1363, 1365 (D.C.1984); *Ungar Motors v. Abdemoulaie,* 463 A.2d 686, 687 (D.C.1983); *Firestone v. Harris,* 414 A.2d 526, 527 (D.C. 1980); *Himmelfarb v. Greenspoon,* 411 A.2d 979, 982 (D.C.1980). The District of Columbia et al. contend that there was an abuse of discretion by the imposition of a penalty either too strict or unnecessary under all the circumstances shown of record, including all prior proceedings. *Id.* at 982. Specifically, they contend the sanction amounted to a default; that Judge Braman was motivated by a desire to punish the District of Columbia for what he perceived to have been transgressions by it in prior cases; that the trial court did not evaluate whether Henderson had suffered prejudice from their non-disclosures; and that while the recitals in the trial court's Memorandum and Order referred only to the District of Columbia, the sanctions were applied to the individual defendants also, including Chief Turner (who did not become a party in any capacity until after the Order).

In fact, the District of Columbia et al. never opposed the motion to impose sanctions and never sought reconsideration thereof under the Rules. Indeed, they sought no relief from that order until midtrial, although they had been placed on notice by Henderson of his intention to introduce the "conceded facts" at trial. It was only during trial, when Henderson sought to introduce the "conceded facts,"

---

**9.** Joel P. Bennett, Esq., Arthur B. Spitzer, Esq., and Ralph J. Temple, Esq.

**10.** Rule 37(b)(2), in pertinent part, provides:
If a party ... fails to obey an order to provide ... discovery, ... the Court may make such orders in regard to the failure as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order.

that the District of Columbia et al. objected and sought to have Judge Bacon reconsider Judge Braman's sanction order. Judge Bacon declined to do so, citing the doctrine of law of the case. Thus, it is Judge Bacon's order which is technically the one on appeal here. While we could perhaps dispose of the issue of discovery sanction by evaluating Judge Bacon's order alone, we choose to address the issue by evaluating the underlying order of Judge Braman.

■ The Order itself belies the contention that the sanction amounted to a default. Indeed, the other evidence presented at trial dehors the facts deemed admitted, demonstrates that these facts were not in real controversy. The District of Columbia et al. make much of two phrases in the facts deemed admitted: 1) that the bag which was planted by IAD was planted "with the specific purpose and intent to entrap ... Henderson into committing a criminal offense"; and 2) that Henderson had "inadvertently omitted" properly inventorying the 43 cents. We have no doubt that the jury understood the first phrase to mean that IAD baited a trap hoping "to catch a thief." That this was their hope is clear from the evidence. We reject the suggestion that this language would raise in the mind of a jury the legal issue of "entrapment" where nothing during the trial made reference to that legal doctrine. We find no error with respect to the second phrase as well. The discovery which Henderson sought and which had not been forthcoming was particularly addressed to that issue. *See Himmelfarb, supra.*

■ The District of Columbia, et al., contend that a portion of the court's order indicates that Judge Braman intended to "punish" the District of Columbia. They refer to that portion of the Memorandum and Order which reads: "The Court has been indulgent and generous with the District of Columbia on numerous occasions in granting extensions in spite of the District's notable failure to comply with discovery rules." We disagree that this evinces a desire to punish.

While we can only consider matters made a part of the record in this case and thus must evaluate the sanction order based solely on this record, we cannot insist that the trial court close its eyes to the track record of a litigant on discovery matters in prior cases. However, if we are to evaluate that record in prior cases in determining the propriety of a sanction order in a later case, the trial court must find a way to make that track record a matter of record in the later case.

■ While the Memorandum and Order does not itself address the matter of prejudice, the record clearly demonstrates that prejudice resulted. Henderson was suspended without pay. A trial date had been set for September 8, 1981. As a result of the discovery problems, that trial date had to be reset by Judge Bacon to March 22, 1982. Indeed, discovery orders by Judge Bacon and Judge Pratt, not challenged on this appeal, graphically show the difficulty the trial court had in obtaining compliance with discovery rules by the District of Columbia et al.

■■ Likewise we find no merit in the contention that the trial court erred in applying the sanction against the police defendants. The discovery requests which were the subject of the sanctions were addressed to all the defendants, including the individuals. All defendants were represented by the Corporation Counsel. None of them had complied with discovery rules. Indeed, as the statement of the Assistant Corporation Counsel referenced in the order makes clear, it was his inability to obtain the necessary information from the police department and his clients, some of the ranking officials thereof, that rendered him incapable of responding to discovery or indicating when he would be able to respond. As to the contention relating to Chief Turner, his liability in his official capacity stands on the same footing as that of his predecessor, Chief Jefferson, and his individual liability based on the back pay

issue was not affected by Judge Braman's sanction order. *See* note 2, *supra.*

In sum, we find no abuse of discretion. *See Weisberg v. Webster, et al.,* 242 U.S. App.D.C. 186, 749 F.2d 864, 869–72 (1984). *See generally Johnson v. United States,* 398 A.2d 354 (D.C.1979).

## V

### *Probable Cause*

At the close of Henderson's case, and at the close of all the evidence, the District of Columbia et al. moved for a directed verdict on the claim of false arrest; the court denied the motions. The District of Columbia et al. contend this was error.

■ ■ If probable cause existed for Henderson's arrest, then the arrest was lawful. *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Where the facts are undisputed, the existence of probable cause is a question of law for the court. *Prieto v. May Department Stores Company,* 216 A.2d 577 (D.C.1966). A police officer need not have probable cause in the constitutional sense to prevail in an action for false arrest. Rather, there is a two-prong test of good faith and reasonable belief. To prevail on this defense, the officer must show not only that he had, in fact, a good faith belief that his conduct was lawful, but also that his belief was reasonable. *Wade v. District of Columbia,* 310 A.2d 857, 862–63 (D.C.1973).

■ ■ We cannot say, as a matter of law, that Sgt. Gaines and his colleagues had probable cause to believe that Henderson had committed the offense of grand larceny at the time of his arrest merely because he had been in possession of the planted bag and had failed to log on the property book any money. On this issue as well as that of good faith and reasonable belief, in addition to the other testimony, we note the

testimony of Sgt. John Stitcher, a member of the team that arrested Henderson (but not a defendant in this case) that when he received the signal to arrest Henderson, he assumed that not only had the property book been checked but also the bag itself. In fact, the bag had not been checked. Likewise, we note the testimony of the property clerk at the Fourth District, Officer Jerome Gilchrist, concerning other occasions when money had been in bags turned over to him and not logged on the property book. Since the facts necessary to a finding of probable cause were in dispute, the court did not err in leaving the resolution of that factual dispute to the jury. Likewise, on this record, the issue of good faith and reasonable belief in the lawfulness of the arrest were for the jury to determine.

## VI

### *Liability under § 1983*

Henderson invoked the jurisdiction of the trial court under § 1983 seeking damages for violation of his constitutional rights resulting from defamation, malicious prosecution, suspension without pay, delay in administrative proceedings, and denial of benefits in retaliation for suing.[11] He recovered damages in the jury verdict for violation of his constitutional rights. The District of Columbia et al. say that recovery for denial of due process with respect to the suspension and back pay is barred by such cases as *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Cohen v. City of Philadelphia,* 736 F.2d 81 (3d Cir.1984); and *Lewis v. Hillsborough Transit Authority,* 726 F.2d 664 (11th Cir.1983). They further contend that Henderson "has no due process or constitutional defamation claim against the *individual defendants*" (emphasis added), relying on *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), and *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47

---

**11.** Public Law 96–170 added the District of Columbia to the coverage of § 1983 effective December 29, 1979, as to acts committed thereafter. Pub.L. No. 96–170, 93 Stat. 1284 (codified

at 42 U.S.C. § 1983 (1982)). Thus Henderson could not seek damages under § 1983 for false arrest, his arrest having occurred on December 19, 1979.

L.Ed.2d 405 (1976). Henderson argues that the District of Columbia et al. did not raise these arguments below and that we should not consider them on appeal; that if we do consider them, we should reject them.

Absent a miscarriage of justice which is manifest, we need not, and usually will not, consider in a civil case arguments made for the first time on appeal. *See Scoggins v. Jude,* 419 A.2d 999, 1002 (D.C. 1980); *Miller v. Avirom,* 127 U.S.App.D.C. 367, 384 F.2d 319 (1967). This is the situation presented here. The only reference that was made to this issue was a brief, elliptical reference as follows in the motion for directed verdict at the close of all of the evidence: "it is Defendant's position that those avenues, those administrative avenues, are sufficient and do, in fact, accord the Plaintiff due process." No citation to *Parratt* or other cases were made although *Parratt* had been decided the previous year. We are satisfied that such a brief, elliptical reference is neither sufficient to properly apprise the trial court of the legal basis of a claimed defense nor to preserve it for review in this court. We can find no reference at trial to the claimed defense allegedly arising from *Bush v. Lucas, supra,* or *Paul v. Davis, supra.* This is the first basis on which we reject these assignments of error.

We do so on a second basis as well; assuming they are properly before us, we find no substantive merit to the contentions. In *Parratt,* a state prisoner sued state prison officials in federal court claiming damages under § 1983 for the negligent loss by them of a hobby kit valued at $23.50 which had been mailed to him. After finding state action and negligent loss of property, the Supreme Court held that the property taking was not unconstitutional since Nebraska provided a post-taking procedure which was adequate to satisfy due process. The courts in *Cohen v. City*

*of Philadelphia, supra,* and *Lewis v. Hillsborough, supra,* reached similar results with respect to employee discharges. However, subsequent to oral argument, the Supreme Court decided *Cleveland Board of Education v. Loudermill,* —— U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).[12] We hold that *Loudermill* disposes of the contentions of the District of Columbia et al. adverse to them on the merits of this issue.

*Loudermill* was discharged from his job as a security guard for not disclosing a felony conviction on his application for employment. He appealed to the Cleveland Civil Service Commission which upheld the dismissal some nine months after the appeal was filed. Although the decision of the Civil Service Commission was subject to judicial review in the Ohio courts, Loudermill filed suit in federal court seeking relief under § 1983. He contended that the state statute was unconstitutional on its face since it did not provide for a pre-termination hearing. He further alleged that the statute was unconstitutional as applied because discharged employees were not given a sufficiently prompt post-removal hearing. The district court dismissed for failure to state a claim since the statute that created the property right in the job specified the procedures for discharge. *See Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (plurality opinion). The Court of Appeals for the Sixth Circuit reversed in part and remanded. *Loudermill v. Cleveland Board of Education,* 721 F.2d 550 (6th Cir.1983). The panel majority, after rejecting an argument that the claim was barred for failure to exhaust administrative and state judicial remedies, found that Loudermill was entitled to a pre-termination hearing. The majority affirmed the district court with respect to delay in the post-termination hearing decision not constituting a deprivation of due process. The Supreme Court granted certiorari and held that notice and a

12. We gave the parties an opportunity to submit supplemental briefs addressing *Loudermill;* they did so.

pretermination opportunity for a hearing were required to satisfy due process where an employee has a constitutionally protected property interest in his employment. In discussing the severity of depriving a person of the means to make a living, the Court said, "While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job." *Loudermill, supra,* 105 S.Ct. at 1494. While affirming the Sixth Circuit ruling on the delay of nine months in the decision resulting from the post-termination hearing, the court explicitly recognized that "[a]t some point, a delay in the post-termination hearing would become a constitutional violation," *id.* at 1496, citing *Barry v. Barchi,* 443 U.S. 55, 66, 99 S.Ct. 2642, 2650, 61 L.Ed.2d 365 (1979). The court pointed out that since Loudermill's complaint merely set forth the chronology of the post-termination hearing and asserted that nine months was too long to wait, it did not state a claim of deprivation of due process.

■ We need not determine whether the hearing afforded Henderson before he was suspended indefinitely without pay was a constitutionally sufficient one, *see Loudermill, supra,* 105 S.Ct. at 1497 (Marshall, J., concurring),[13] for we hold that the delay from January 7, 1980 (the date of the preliminary hearing) to April 22, 1981, in bringing trial board proceedings to determine Henderson's status, while he was sus-

pended without pay, was constitutionally unreasonable. In this regard, we note also that exactly one year elapsed between the date that the District of Columbia et al. were notified that the United States Attorney had determined not to prosecute Henderson (April 24, 1980) and the date Henderson was notified of the charges then being referred to the Trial Board (April 22, 1981). Henderson repeatedly requested reinstatement, and no reason appears of record which could have conceivably justified the delay in proceeding. In this regard, we further note that when Henderson sought review by the Office of Employee Appeals (OEA) of Chief Turner's decision not to award him back pay, the Corporation Counsel, on behalf of one or more of the defendants in this case, contended that OEA lacked jurisdiction; at the same time, they were seeking to have the civil action stayed on the grounds of failure to exhaust administrative remedies. This was done in face of the failure of Chief Turner, or anyone else shown on this record, to inform Henderson either of his right to appeal or to which body such an appeal could be taken. This is part of the administrative process which the District of Columbia et al. argue is "constitutionally adequate."[14]

■ To support their claim that Henderson has no due process or defamation claims against the *individual* defendants, the District of Columbia et al. rely on *Bush v. Lucas, supra,* and *Paul v. Davis, supra.* This reliance is misplaced.[15] *Bush* involved

---

**13.** We note that on December 21, 1979, Asst. Chief Tapscott, as Acting Chief, approved the recommendation of Inspector Wilson dated December 20, 1979, that Henderson be suspended indefinitely without pay. On January 11, 1980, it was Tapscott who conducted the "hearing" on the "proposed" suspension. In this regard, we particularly note the language of Marshall, J., in *Loudermill, supra,* 105 S.Ct. at 1497: "I continue to believe that *before a decision is made to terminate an employee's wages,* the employee is entitled to an opportunity to test the strength of the evidence ..." (emphasis in original). *See also Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) (the opportunity to be heard must be "at a meaningful time and in a meaningful manner").

**14.** The existence of an adequate state remedy does not foreclose a remedy under § 1983 where there is a non-random deprivation of tangible personal property. *Parratt v. Taylor, supra,* is distinguishable on this basis. *Lavicky v. Burnett,* 758 F.2d 468 (10th Cir.1985); *Coleman v. Turpen,* 697 F.2d 1341 (10th Cir.1982).

**15.** Query whether there is an independent reason which would make resolution of this matter academic as a practical matter. The District of Columbia does not contest its liability under § 1983 on this basis. Having conceded at oral argument that the District of Columbia (as distinguished from the individual defendants who were found jointly and severally liable) would pay all compensatory damage, it is doubtful if

a suit by an employee of the federal government against his supervisor, an official of N.A.S.A., claiming deprivation of constitutional rights resulting from defamation and retaliatory demotion. The suit was brought as one springing directly from the Constitution under *Bivens*. The Supreme Court reviewed its power to grant relief not expressly authorized by Congress, and analyzed its prior holdings granting or not granting such relief in the absence of a statute. It concluded that given the existence of a comprehensive statutory scheme of Civil Service protections, including the Back Pay Act of 1966, 5 U.S.C. § 5596 (Supp. V 1981 & 1982) (which the Court found Congress intended to be a vehicle for comprehensive compensatory damage), there existed such special factors which would cause the Court to defer to Congress to create a remedy for the constitutional violation. Here, in an action brought under § 1983 against defendants subject to § 1983 (as the United States is not), there has been an explicit congressional enactment creating the remedy. *Bush* is simply inapposite. *See Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).

Their reliance on *Paul v. Davis, supra*, is equally erroneous. In *Paul v. Davis*, the Court, in distinguishing *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), stated, "Thus it was not thought sufficient to establish a claim under § 1983 and the Fourteenth Amendment that there simply be defamation by a state official; the defamation had to occur in the course of the termination of employment." *Paul v. Davis, supra*, 424 U.S. at 710, 96 S.Ct. at 1165. *Roth* is the decision which controls on the facts in this case.[16]

the individual defendants have any meaningful stake in our resolution of this question.

**16.** We note that the refusal to give Henderson the back pay to which he had been determined to be entitled because of his pending civil suit seeking relief is an independent basis for liability under § 1983. *See Hudson v. Palmer*, —— U.S. ——, 104 S.Ct. 3194, 3197 n. 4, 82 L.Ed.2d 393 (1984).

In conclusion we hold that the evidence was clearly sufficient to sustain the jury verdict that the District of Columbia et al., acting under color of law and as a matter of official governmental policy or custom within the meaning of 42 U.S.C. § 1983, acted to deprive Henderson of various of his constitutional rights.

## VII

### *Immunity*

For the first time on appeal, the District of Columbia et al. contend that they were absolutely immune from any liability to Henderson on his local law claims. This contention is made in the face of the fact that the District of Columbia et al. never pleaded absolute immunity as an affirmative defense as is required by Super. Ct.Civ.R. 8(c), never asserted such a defense at trial, and never requested instruction from the trial court on this basis. Indeed, in both their answer to the complaint and their answer to the amended complaint, the District of Columbia et al. affirmatively asserted that all actions taken by them were reasonable and in good faith, *i.e.*, entitled to a qualified privilege. They tried the case on this basis, and pursuant to a request by them, the court instructed the jury on this basis. It is the height of disingenuousness for them now to complain that the trial court erred by doing just what they had requested the court to do on this issue from the beginning to the end of this litigation. They will not be heard. *Hackes v. Hackes*, 446 A.2d 396, 398 (D.C. 1982); *Miller v. Avirom, supra; Whelan v. Welch*, 50 U.S.App.D.C. 173, 269 F. 689 (1921).[17]

**17.** Their contention concerning absolute immunity is plainly erroneous anyway. *See Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967); *District of Columbia v. Gandy*, 450 A.2d 896 (D.C.1982), *as modified*, 458 A.2d 414 (D.C.1983), *reh'g en banc denied*, 466 A.2d 851 (D.C.1983).

## VIII

### Back Pay and Benefits

After judgment was entered, Henderson moved to amend it or for other relief based on his contention that the jury intended to award back pay plus $30,000 as compensatory damages. He filed affidavits of all the jurors attesting that this was their intention. Henderson further contended the court should award the annual and sick leave to which he was entitled. By order filed March 30, 1983, Judge Bacon denied relief.

The general rule is that a party cannot impeach a jury verdict by evidence given by the jurors. *McDonald v. Pless,* 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); *Khaalis v. United States,* 408 A.2d 313, 359 (D.C.1979); *Sellars v. United States,* 401 A.2d 974, 981–82 (D.C.1979); *Freid v. McGrath,* 77 U.S.App.D.C. 385, 135 F.2d 833 (1943). The general rule has exceptions. The one upon which Henderson relies is that which permits such evidence to establish that the true verdict intended by the jury was incorrectly recorded. *See Sellars v. United States, supra,* 401 A.2d at 981; *Freid v. McGrath, supra,* 77 U.S.App.D.C. at 386, 135 F.2d at 834. The decision of a trial court in the area will be affirmed, absent an abuse of discretion. *Id. See generally Johnson v. United States, supra.*

On this record, we are satisfied that the affidavits of the jurors should have been considered under the improper recordation exception and that the trial court's refusal to do so constituted an abuse of discretion. We say this for four reasons.

First, in order to determine the quantum of back pay to which Henderson was entitled, one would first have to know in which rank his back pay accrued. There was evidence before the court on pay loss as an Officer and as a Master Patrol Officer. The trial court had not submitted the issue of retroactive promotion to the jury. Rather, it had reserved this question to itself as part of the equitable relief. Post-trial, retroactive promotion was ordered. Without knowing in what grade they were to consider back pay, there was no basis on which the jury could have made a proper decision on the quantum of damage on this issue.

Second, the jury verdict form on this issue is far from being a model of clarity. The jury was asked to respond yes or no to the question of entitlement. They did so by answering yes. Although the next question asks the jury to state the total of compensatory damages for defendants liability on "parts A, B, C, D, or E" (E referring to back pay), it is only the most careful scrutiny of the form which would cause the jury to realize the lump sum figure should include compensation for back pay.

Third, nothing in the instructions served to clear up the matter. Nothing highlighted the fact that if the jury answered yes to the question of whether Henderson was entitled to back pay, they then should turn to the question of determining the amount thereof.

Fourth, nothing in the verdict form or instructions informed the jury that they were to determine the issue of annual and sick leave or how to go about doing so, *e.g.,* determine entitlement with MPD or the trial court to do the necessary mathematics to determine how many hours of each Henderson was entitled to or whether they were to determine a monetary compensation therefor.

In our view, *on the narrow and unique set of facts shown by this record,* the trial court abused its discretion. We are buttressed in our view by such decisions as *Washington, Virginia & Maryland Coach Co. v. Marbury,* 167 A.2d 791 (D.C.1961); *Myrtle v. Checker Taxi Co.,* 279 F.2d 930 (7th Cir.1960); *Woodworkers Tool Works v. Byrne,* 191 F.2d 667 (9th Cir.1951); and *Freid v. McGrath, supra,* where juries were recalled to clarify their verdicts.

## IX

### Attorney's Fees

Pursuant to 42 U.S.C. § 1988, Henderson sought an award of attorney's fees and

costs in the sum of approximately $177,-000.[18] Section 1988 provides that in civil rights actions, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." What is a reasonable fee in particular cases has engendered considerable litigation, despite admonitions by courts that the parties attempt to resolve fee issues by agreement. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941–42, 76 L.Ed.2d 40 (1984); *McGowan v. King, Inc.*, 616 F.2d 745, 747 (5th Cir.1980); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir.1974). The parties here did not resolve this question by agreement; rather, they left it for the trial court to determine. We must now review this decision of the trial court.

In *Hensley v. Eckerhart, supra,* the Supreme Court set forth the factors to be considered by a trial judge in determining an award under § 1988. The Court noted that the purpose of § 1988, which was enacted in response to the Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), was to insure adequate access to justice by those claiming violation of civil rights. The legislative history of § 1988 cites with approval such cases as *Johnson v. Georgia Highway Express, Inc., supra.*[19] These citations indicate the relationship between the amount of the fee to be awarded and the results obtained from the litigation. *Hensley v. Eckerhart, supra,* 461 U.S. at 430, 103 S.Ct. at 1937–38.

The trial court must first determine whether the claimant was a "prevailing party" under § 1988. A party has prevailed for the purpose of attorney's fees if he has succeeded on any of the significant issues in the litigation which achieved some of the benefits sought by bringing the suit. *Id.* at 433, 103 S.Ct. at 1939. Where, as here, the trial court has determined that the fee claimant is a prevailing party, the court must determine what is a "reasonable fee." "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* In determining the number of hours reasonably expended, billing judgment must be exercised, and hours that are "excessive, redundant or otherwise unnecessary" must be excluded. *Id.* at 434, 103 S.Ct. at 1939–40. In determining a reasonable rate, § 1988 and its legislative history establish that such rates are to be calculated according to the prevailing rates in the relevant community. *Blum v. Stenson*, —— U.S. ——, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). *See also Copeland v. Marshall*, 205 U.S. App.D.C. 390, 402, 641 F.2d 880, 892 (1980). By multiplying the reasonable hourly rate by the number of hours reasonably expended, one arrives at a figure often referred to as the "lodestar". *Id.* 205 U.S.App.D.C. at 401, 641 F.2d at 891. Once the "lodestar" has been determined, the court must next turn its attention to upward or downward adjustments thereto. Among the factors the court may consider in making such an adjustment are the twelve factors enumerated in *Johnson v. Georgia Highway Express, Inc., supra,* keeping in mind that many of those factors usually are subsumed within the "lodestar" calculation. *Hensley v. Eckerhart, supra,* 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9; *Copeland v. Marshall, supra,* 205 U.S.App.D.C. at 402–04, 641 F.2d at 892–94. One of the more significant factors to be considered in determining whether to make adjustments to the "lodestar" is the results obtained. *Hensley v. Eckerhart, supra,* 461 U.S. at 434, 103 S.Ct. at 1939–40. This factor may

---

18. This amount covered work done through December 1982. It did not include fees and costs associated with the application for fees, for which Henderson sought an additional amount of approximately $13,000. The trial court awarded approximately $76,000 to cover both.

19. S.Rep. No. 1011, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Ad.News 5908; H.R. Rep. No. 1558, 94th Cong., 2d Sess. (1976).

result in either an upward or downward adjustment. *Id.* In determining what is a reasonable fee, the court may either "attempt to identify specific hours that should be eliminated" in calculating the lodestar "or it may simply reduce the award to account for the limited success." *Id.* at 436–37, 103 S.Ct. at 1941–42. The identity of the party against whom the fees will be charged, *i.e.,* individual vs. governmental defendants, or whether representation was provided by private or nonprofit counsel is irrelevant. *Blum v. Stenson, supra.*

Here, the trial court made two different types of adjustments in determining the reasonable fee—adjustments on hourly rates and a 20 percent reduction of the award calculated by multiplying the hourly rates determined by the court by the hours claimed by the attorneys, because of the "excessive" and "extravagant" use of time in light of "limited success." We evaluate each of them in turn.[20]

The fee request sought compensation for three attorneys—Geraldine Gennet, Robert M. Jones, and Nicholas S. McConnell—as well as paralegals, law clerks and investigators. The trial court made downward adjustments to the hourly rates of all of these save McConnell.[21]

Gennet's work covered several years during which she had "billing rates" which differed. Her billing rates were $75 per hour during 1980, $85 per hour during 1981, and $100 per hour during 1982. She sought compensation at the rate of $100 per hour, *i.e.,* the "current rate" for all hours expended, rather than the "historical rates." The trial court determined the reasonable rate to be the "historical" one, *i.e.,* for work performed during 1980, $75 per hour, etc. This ruling is not specifically challenged on appeal; on the facts of this case, we see no reason to disturb it.

 Compensation for Jones' work was sought at an hourly rate of $75. The trial court awarded $30 per hour. Jones

had been admitted to practice for approximately 18 months. He was retained to assist in final preparation for trial and trial itself. He had no prior experience in § 1983 cases. He billed approximately 321 hours. Judge Bacon held that Jones

> did not serve as a co-counsel sharing trial responsibilities. His services were that of a clerk, paralegal, or a very junior attorney. His work should be compensated in an amount which is more commensurate with the $20.00/hour rate for GS–12 government attorneys. Recognizing overhead for the private practitioner, the reasonable billing rate would be $30.00/hour.

We hold that the trial court erred in this holding. We first note that it is inappropriate to determine the reasonable hour rate by extrapolating from government pay scales. In this regard, in *Blum v. Stenson, supra,* while unsuccessfully urging the Court to adopt a different formula for compensation awards made to nonprofit legal aid type counsel, the Solicitor General of the United States conceded that market rate compensation must reflect the level of compensation necessary to attract profit making attorneys to accept such cases. 104 S.Ct. at 1546. The focus is properly on the prevailing rate in the *private, profit-making sector. Id.* at 1546–47. We note with approval the language of *Copeland v. Marshall, supra,* in rejecting references to set pay scales such as GS ratings as an appropriate measuring tool:

> Indeed, to appraise the reasonable value of an attorney's time by '[r]eference to absolute salary levels is about as reasonable as deriving the reasonable value of a federal judge's time from his or her salary. *Rodriquez v. Taylor,* 569 F.2d 1231, 1248 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978).'

205 U.S.App.D.C. at 409, 641 F.2d 899; *see also North Slope Borough v. Andrus,* 515

---

20. We find the District of Columbia et al.'s challenge to the fees awarded devoid of merit.

21. McConnell's fee request was with respect to the preparation of the application for fees.

F.Supp. 961, 968 (D.D.C.1981) (Robinson, J.) (*Copeland*'s rejection of references to set pay scales renders the salaries of government attorneys for similar work wholly irrelevant). Further, the record does not support the conclusion that the work done by Jones was basically duplicative, or of the kind that could have been performed by a paralegal or law clerk as distinguished from a "junior attorney," (all of whom Judge Bacon lumped in one basket). The court should have determined the reasonable hourly rate for one of Jones' background and experience based on the reasonable rate prevailing in the private profitmaking legal community in the District of Columbia. *Blum v. Stenson, supra,* 104 S.Ct. at 1547 n. 11; *Laffey v. Northwest Airlines, Inc.,* 241 U.S.App.D.C. 11, 746 F.2d 4 (1984).

■ Likewise, the trial court reduced the rate of compensation for paralegals (including law clerks and investigators) from $20 per hour to $15 per hour. The court did so by reference to government pay scales under the Criminal Justice Act of 1964, as amended, 18 U.S.C. § 3006A (1982) (an act providing for compensation for representing indigent criminal defendants) and to the pay scales for judicial law clerks. We hold the court erred for the reasons on which we based our holding as to Jones' hourly rate.[22]

We next turn to the 20 percent reduction the trial court imposed to exclude what it found to be the "excessive" and "extravagant" use of time in light of "limited success." We commence this analysis mindful not only of the deference we owe to the trial court on rulings committed to its discretion, *see Johnson v. United States, supra,* but also remembering that while Parties against whom attorney's fee awards may be sought are not "required to yield an inch or to pay a dime not due, they may by militant resistance increase the exertions required of their opponents and thus,

if unsuccessful, be required to bear that cost." *McGowan v. King,* 661 F.2d 48, 51 (5th Cir.1981) (*McGowan III*). *See also Copeland v. Marshall, supra,* 205 U.S. App.D.C. at 414, 641 F.2d at 904 ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response").

■ Trial judges are not required to engage in a document-by-document examination of the case record and compare each document to the attorney's time claims with respect thereto. Nor should the court be saddled with determining whether preparation of a particular pleading should have taken only four hours in contrast to the seven hours claimed. The Supreme Court and other federal courts have eschewed such an approach. *See Hensley v. Eckerhart, supra; Copeland v. Marshall, supra; Lindy Bros. Builders Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir.1976). Here, the trial court used the alternative approach sanctioned by these cases—a percentage reduction. Commendably, however, the trial judge set forth examples of what she deemed to be excessive, imprudent, and duplicative time expenditures. They include research on evidentiary questions (*e.g.,* admissibility of polygraph test results); preparation for and taking the depositions of Sgts. Gaines and Arnold; pretrial preparation time; and time spent on the telephone.

■ We conclude that the trial court abused its discretion in applying a 20 percent reduction based on its conclusion, which we find to be erroneous, that this case was a garden variety tort case, unduly complicated and placed out of focus by the needless interjection of § 1983 claims, culminating in limited success devoid of institutional or societal significance. First, this

---

**22.** The trial court also based its decision on what it found to be the hourly rate paid by Joel Bennett, Esq. to paralegals in civil rights cases. Our reading of the record raises doubt as to the

evidentiary support for such a conclusion. *See* Affidavit of Bennett, with attachments, at 1213–1236 of the Record.

appears to have been one of the first § 1983 actions tried in the Superior Court (and the first considered by this court on appeal). In light thereof, counsel for Henderson could fairly conclude that the judges of the District of Columbia courts (both trial and appellate) did not have an extensive background in § 1983 litigation. Thus, counsel could reasonably conclude that it was prudent to thoroughly prepare all aspects of the case, both factual and legal, to assist the court in preparing to rule on questions of law in § 1983 claims. Second, the fact that Henderson could have sued for false arrest, malicious prosecution, defamation, etc., under District of Columbia law does not detract from the merit of bringing an action under § 1983. In a case such as this, the fact that state or municipal law may provide a damage remedy neither forecloses nor detracts from the viability of § 1983 claims. *See Cleveland Board of Education v. Loudermill, supra.* To permit a court to consider the adequacy of a state or local law remedy in deciding the amount of attorney's fee to be awarded as costs under § 1988 would appear to denigrate the policies which Congress sought to implement by enacting § 1988—to ensure equal access to justice by those claiming violations of civil rights, *see Hensley v. Eckerhart, supra,* 461 U.S. at 429, 103 S.Ct. at 1937, and to deter governmental misconduct. *See id.* at 433 n. 7, 103 S.Ct. at 1946 n. 7; *Copeland v. Marshall, supra,* 205 U.S.App.D.C. at 409, 641 F.2d at 899.

■ We think the trial court erred further in concluding that the suit had limited success devoid of institutional or societal significance other than to Henderson, individually. There simply is nothing in the record that supports such a conclusion; what is in the record or is judicially knowable tends to contradict such a conclusion. First, the record does reflect, and the District of Columbia et al. concede, that by virtue of a collective bargaining agreement between the union representing members of MPD and the District of Columbia, the type of delays in personnel actions that occurred in this case are not likely to recur. The agreement (effective Nov. 1981) sets specific time limits for certain personnel actions and removed many of such actions from Trial Board consideration to new procedures established by Article 13 of the agreement. Second, we note that the Henderson case became a cause celebre with the union and likely played a role in the bargaining process leading to the new agreement with the new protections and procedures contained therein. Third, in light of the following language from *Blum v. Stenson, supra,* even if only Henderson benefited, we doubt whether that is relevant in a § 1988 computation:

> Nor do we believe that the number of persons benefited is a consideration of significance in calculating fees under § 1988. Unlike the calculation of attorney's fees under the "common fund doctrine," where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation. Presumably, counsel will spend as much time and will be as diligent in litigating a case that benefits a small class of people, or, indeed, in protecting the civil rights of a single individual.

104 S.Ct. at 1549 n. 16.

An additional basis of our concerns with the fees awarded springs from the question of whether the trial court gave sufficient consideration and weight to the impact of the conduct of the District of Columbia et al. in conducting this litigation on the hours reasonably expended by Henderson's attorneys. The record discloses that the District of Columbia et al. had to be brought kicking and screaming to the bar of justice. Much of the time spent by Henderson's attorneys could have been saved if the District of Columbia et al. had conducted this litigation in a less obstructionist manner.

We have already set forth some of the problems Henderson had in obtaining discovery. We note that the trial court excluded from the fee calculation the total

amount claimed as attorney's fees as a discovery sanction pursuant to Super.Ct. Civ.R. 37(a)(4) rather than the amount actually awarded. Query whether the test for reasonable expenses under Rule 37(a)(4) is the same as under § 1988. We need not decide this, for the trial court, on remand, may reconsider the matter and state its rationale more precisely—*i.e.*, the trial court may have intended by its ruling to hold that the amount previously awarded as sanction in fact constituted reasonable compensation under § 1988. On the other hand, it may hold otherwise and modify this part of its ruling.

While under unusual circumstances we might be justified in substituting our judgment for that of the trial court on a fee issue under § 1988; *see Frazier v. Franklin Investment Co.*, 468 A.2d 1338 (D.C. 1983), relying on *McGowan III, supra,* we do not think this to be the type of situation which would justify our doing so. Rather, we remand this issue to the trial court to redetermine the attorney's fees, etc., under § 1988, consistent with this opinion.[23]

## X

### Conclusion

This litigation spanned three years in the trial court, including a nine day trial. It involved significant legal issues in a developing area of civil rights law. Both Judge Braman and Judge Bacon, the two Superior Court judges to whom this case was individually assigned, handled the litigation in the finest traditions of the trial judiciary. The fact that we find error in certain rulings in no way detracts from this conclusion. We affirm all of the judgments appealed except for that which denied the motion to modify the judgment with respect to back pay, benefits, and the attorney's fee award. As to those items, we remand for further proceedings consistent with this opinion.

*So Ordered.*

**23.** We find no abuse of discretion in the trial

court's ruling on fees for the fee petition.