**Phoebea QUEEN t/a Phoebea Queen Real Estate, Appellant,**

v.

**Jeffrey POSTELL, et al., Appellees.**

No. 84–1702.

District of Columbia Court of Appeals.

Argued May 7, 1986.
Decided Aug. 5, 1986.

Margaret A. Beller, with whom Carolyn R. Just, Washington, D.C., on brief, for appellant.

Robert J. Greenleaf, Silver Spring, Md., for appellees.

Before PRYOR, Chief Judge, NEBEKER, Associate Judge, and REILLY, Senior Judge.

REILLY, Senior Judge:

This is an appeal from an order denying a motion for judgment notwithstanding the verdict, following an action for damages on a complaint alleging wrongful eviction, breach of covenant of quiet enjoyment, and conversion of personalty. The challenged verdict was returned by a jury in an action against a real estate broker, Phoebea Queen, brought by Jeffrey Postell, the lessee of an apartment, and his wife Claudia Rowell. They had been evicted from his apartment some four months previous to

the commencement of this action on a writ of restitution issued after a default judgment for summary possession had been entered against them in the Landlord and Tenant Branch of the trial court.[1]

Appellant, the defendant below, contends that (1) the action was barred under the doctrine of *res judicata* by reason of the default judgment, (2) on the evidence adduced at trial, no jury could reasonably have returned a verdict in plaintiffs' favor, and (3) there was no evidence to support the jury's award of punitive damages. We agree only with the last contention.

The evidence at trial may be summarized as follows:

Postell testified that on or about May 17, 1982, he signed an agreement with Queen[2] for lease of an apartment unit in a building on Oklahoma Avenue, N.E. The lease called for monthly payment of rent in the amount of $231.91, as well as a down payment of $230 as a security deposit.[3] Because the lease commenced in mid-month, rent for the month of May was prorated to $126—an amount also paid in advance.

Postell and Claudia Rowell (later Mrs. Postell), did not move into the apartment until May 27, although the term of the lease began 10 days earlier. His testimony was that he could not obtain the keys to the apartment until May 25, and then discovered that these keys would not unlock the front door, and that despite complaints to Queen, the door could not be properly closed until he obtained a new lock himself.

This portion of the testimony was contradicted by Queen and by a maintenance man. Her position was that the unit was ready for occupancy and that any delay in moving in was occasioned by Postell's own failure to keep an appointment with her

when she visited the unit to see that the defective door was repaired. This controversy soon became the subject of a rental dispute.

When the June rent was due, the tenants forwarded to Queen $116 in a letter stating that this sum represented payment of the rent for that month less a set-off of rent paid in May for the period Postell claimed the unit unavailable for occupancy. Queen replied in a letter, dated June 8, that this deduction was unacceptable and that the sum of $77.63 was still owed the landlord.

When Postell did not answer promptly, the landlord on June 22 began an action for summary possession predicated upon a refusal to pay rent. Postell was aware that the accompanying summons required his appearance in court on July 12, for in a letter enclosing the July rent—which Queen received early that month—he restated his reasons for not paying the disputed portion of the May rent, but offered to compromise by paying the sum of $33.63. The letter stated that if Queen was still dissatisfied, he would "see [her] in court on July 12th."

Postell, however, did not appear in court on the trial date, and a default judgment was entered. Soon thereafter, a writ of restitution was issued to the office of United States Marshal. On July 27, a marshal with a moving crew came to the Postell apartment and finding neither occupant there arranged the removal of furniture and other contents of the apartment to the sidewalk. According to Postell's testimony, the eviction was entirely unexpected, as he had assumed from information his fiancee had given him that Queen had withdrawn the suit for possession pursuant to a settlement arrived at in a telephone conver-

1. Appellees' complaint, which was amended before trial, also contained a count of retaliatory eviction. At trial, the court granted appellant's motion for a directed verdict on this count. Appellees did not further pursue this claim, and it is not a subject of review in this appeal.

2. Queen was employed at the time as the landlord's real estate broker and had responsibility

for managing the apartment building involved here.

3. This lease was not designated as part of the record on appeal, but in oral argument it was stated that all the parties agreed that Claudia Rowell, the fiancee of the lessee, would also occupy the leased premises.

sation between the two women on July 9. On that particular day, he left the city to join the Baltimore Colts at their football training camp in Reistertown, Maryland, thinking it was not necessary to appear in court on July 12th in the landlord and tenant action.

He testified that he did not become aware that any eviction was in prospect until July 27, when he telephoned the apartment from the training camp. A man answered the call, identifying himself as a marshal carrying out an eviction. Postell then called his wife at work. She returned home and found their furniture on the street. According to Postell, his wife then discovered that several items were broken and that other articles were missing.

The testimony of Rowell was that she informed Postell that she had telephone Queen on July 9 and had made an offer, which was then accepted by Queen, to settle the rent dispute by paying $77.63 on August 1 with that month's rent. On the basis of this agreement, Rowell assumed the rental dispute had been resolved and no appearance in court was required.[4] Rowell added that there was no communication with Queen between July 9 and July 27, the date of eviction. Rowell testified further that although she and Postell received notice of Queen's suit of possession, neither received notice that the eviction would be carried out.

Queen's account of the events in July created a sharp conflict of testimony on every critical issue. She testified that there was no telephone conversation with Rowell on July 9, and that she did not hear from either tenant after receiving the letter from Postell on the first of the month

stating that he would see her in court on July 12th, until July 22, when Rowell telephoned her. By that time, the default judgment had been entered, for Rowell alluded to her receipt of a writ of "eviction" —presumably either a writ of restitution or a notice of the judgment creditor's application for such a writ.[5] According to Queen, Rowell then inquired "if she could pay the rent that was past due in with the rent, August 1, 1982," but she rejected this offer stating that unless she [Rowell] paid up prior to or on the date of the eviction, she would be evicted. The witness said there was no further response from the tenants until July 27, when Rowell telephoned to complain about the eviction in process, and threatened to sue.

Queen also testified that she did not return the security deposit to the lessee, explaining that she expended the balance in paying for the costs of the eviction and for cleaning the vacated apartment before showing it to prospective tenants.

■■■ Prior to trial, defendant Queen had moved for dismissal of the action, asserting that the default judgment for summary possession amounted to *res judicata.* This motion was denied, the court noting that the pending complaint for wrongful eviction was based "on some form of fraud or misrepresentation" in procuring that judgment.

In charging the jurors, however, the court did not say that the eviction could be deemed wrongful only if they found that the defendant engaged in fraud or misrepresentation. After stating that if they believed Queen's testimony they should return a verdict for the defendant, the court then instructed the jury as follows:

---

**4.** In response to her counsel's question as to why "you didn't show up on that particular date [July 12]," she answered: "I didn't show up because I felt the court date was off. The case was settled, so why did we have to go to court."

**5.** Under Super.Ct. L & T R. 16(a), a three-day notice to tenant must be filed with the clerk of the court when the writ is ordered. When the clerk delivers the writ to the marshal, the latter is required to mail notices to the tenant before

executing the writ, thereby giving the tenant an opportunity to avoid eviction by paying whatever arrearage of rent the judgment specifies. *Trans-Lux Radio City Corp. v. Service Parking Corp.,* 54 A.2d 144, 146 (D.C.1947). Both appellees here denied receiving either notice, and the jury by its verdict apparently concluded that neither the landlord's lawyers nor the U.S. Marshal had complied with the notice rules.

Now, as to the claim for a wrongful eviction. A tort is a personal wrong committed by one person against another as opposed to a crime where the wrong is committed against the State. In this jurisdiction, the wrongful eviction of a tenant by a landlord is a tort and entitles the tenant to sue the landlord. In deciding the plaintiffs' claim for wrongful eviction, you should determine whether the eviction violated an alleged compromise or settlement concerning any outstanding balance on the plaintiffs' account.

You should first determine by preponderance of the evidence whether you believe a settlement or compromise was created concerning the payment of the outstanding balance.

For the purpose of this case, no particular form of agreement and no writing is essential to achieve a valid compromise or settlement. Where concessions are mutually made, a compromise or settlement will be found and, thereafter, one party may not cancel it without the other parties' consent.

If you believe the dispute over the payment of the outstanding balance was settled or compromised, then you are instructed that the defendant's eviction of the plaintiffs is wrongful if it violated that settlement or compromise. In that case, your verdict should be for the plaintiffs and you should proceed to determine what, if any, compensatory or punitive damages should be awarded to the plaintiffs. . . .

Implicit in this instruction is the premise that even though no express commitment was made to dismiss or postpone the pending lawsuit, the party being sued had a right to assume once the settlement offer was accepted that it was under no duty to appear in court or take any other steps to avert a default judgment.

The trial court did not err in giving this instruction. In our opinion if a plaintiff in a lawsuit unequivocally accepts a settlement offer, this has the effect of lulling the defendant into believing that interposing a defense or filing a motion to dismiss is unnecessary. Hence, even if a plaintiff did not deliberately intend to trick his opponent into foregoing a defense or missing a trial date, he may be liable for breach of contract unless he instructs his counsel to act affirmatively to prevent execution of a default judgment. A showing of actual fraud or collusion is unnecessary.[6] *See general-*

---

**6.** The post-judgment record indicates some confusion on this point. The trial court in denying the motion for judgment n.o.v., *predicated on the plea of res judicata,* did cite, *inter alia,* a Supreme Court opinion, *Riehle v. Margolies,* 279 U.S. 218, 225, 49 S.Ct. 310, 313, 73 L.Ed. 669 (1929), for the proposition that "a judgment . . . operates as *res judicata* in the *absence of fraud or collusion,* even if obtained upon a default." [Emphasis in original.] The court then went on to say:

Since the jury has already established that defendant's default judgment was obtained fraudulently, *i.e.,* that the plaintiffs were wrongfully evicted, defendant cannot now invoke the doctrine of *res judicata.*

In her motion defendant focuses on one of the major issues of the trial, whether a settlement occurred between the parties in which plaintiff paid past-due rent, in the belief that by so doing, defendant would not evict them. Plaintiffs contended they were induced by such agreement into the belief they did not have to defend themselves in the eviction action because the matter had been settled. The issue of wrongful eviction is one of fraud, and fraud is a question of fact for the jury, not this court, to decide

. . . .

Obviously, the court was inaccurate in stating that the jury in determining that the eviction was wrongful found that the default judgment had been fraudulently obtained. It overlooked its own instructions, which we have quoted in the text, *supra.* Under those instructions, the jury was directed to find for the plaintiffs, if the settlement agreement was violated. No mention was made that such breach of agreement had to be the product of fraud.

The quotation from the *Riehle* decision does not mean that fraud and collusion are the only grounds for depriving a default judgment of binding effect. Such judgments may also be vacated upon a showing of lack of notice, mistake, excusable neglect, etc. What was decided in *Riehle* was that judgments obtained by creditors in state courts, even in uncontested actions, should be treated as final adjudications of claims drawn into issue in federal receivership proceedings. Obviously Mr. Justice Brandeis,

*ly* RESTATEMENT (SECOND) OF JUDGMENTS §§ 67, 68, illustration 2 (1982).

Accordingly, we must reject appellant's contention that even though a verbal settlement had been reached, it was necessary for the defendant in the landlord and tenant suit to present testimony to this effect on the specified trial date. Hence, we affirm the trial court's ruling that the appellees' action for damages was not barred by the principle of *res judicata. Davis v. Bruner,* 441 A.2d 992 (D.C.1982), *aff'd en banc by evenly divided court,* 470 A.2d 1248 (D.C.1983) (per curiam), upon which appellant relies is clearly distinguishable. In that case, the landlord who obtained the challenged judgment had done nothing to deter the tenant from timely raising an issue which was not presented to the trial court until after the judgment was entered.

■ Appellant also argues that it was error for the trial court to deny the motion for judgment n.o.v., asserting that on the evidence no reasonable juror could have concluded that Queen's summary of her telephone communications with Rowell was incorrect, as her testimony was corroborated by her secretary and by office records. It is of course true that plaintiffs' contention that a settlement occurred pretrial rests entirely on Rowell's testimony.[7] Nevertheless, it was within the province of the jury to resolve the question of credibility in Rowell's favor. As we have frequently observed, this court has "no power to weigh the evidence or to pass upon the credibility of witnesses." *V.E.M. Hotel Service, Inc. v. Uline, Inc.,* 190 A.2d 812, 813 (D.C.1963).

■ Once the jury under proper instructions found the eviction wrongful, it was authorized to award damages to compensate the tenants for the loss of property which occurred when the furniture was piled unguarded on the street and to reimburse the plaintiffs for the security deposit and a portion of the pre-paid rent. Thus, we do not disturb the verdicts for compensatory damages listed in the special forms returned by the jury.

An application of the same evidentiary standards, however, compels us to reverse that portion of the post-trial order which permitted the judgment for punitive damages to stand.[8] The record discloses no evidence upon which the jury could find that the "act or acts of the defendant were malicious and in willful and in wanton and reckless disregard of plaintiffs' rights"—a finding which the trial court in its final instructions told the jury was necessary to permit an award for punitive damages.

Such instructions were not improper on their face as the text is a reasonable paraphrase of our recent holding on punitive damages in *Boynton v. Lopez,* 473 A.2d 375, 377–78 (D.C.1984), where we said:

The punitive damages award, according to appellant, was incorrect because the tortious act was not "aggravated by evil motive, actual malice, deliberate violence or oppression." *Price v. Griffin,* 359 A.2d 582, 589 (D.C.1976) (quoting *Black v. Sheraton Corp. of America,* 47 F.R.D. 263, 271 (D.D.C.1969)). The tortious act must be "willful and outrageous conduct," *Spar v. Obwoya,* 369 A.2d 173, 180 (D.C.1977) (quoting *Harris v. Wagshal,* 343 A.2d 283, 288 (D.C. 1975)), or it must result in gross fraud. *Spar v. Obwoya, supra,* 369 A.2d at 180. *See Mariner Water Renaturalizer of Washington, Inc. v. Aqua Purification Systems, Inc.,* 214 U.S.App.D.C. 248, 253, 665 F.2d 1066, 1071 (1981). While the record supports the finding of intentional

the author of the opinion, was not attempting to compile a complete catalogue of all the exceptions to the applicability of *res judicata.*

7. Postell's testimony with respect to the acceptance of the offer of settlement was not entitled to any weight for it admittedly was based upon hearsay, *i.e.,* what his fiancee had told him.

8. The jury found the plaintiffs should recover the sum of $6,000 in punitive damages for wrongful eviction and $804.72 in punitive damages for conversion—in addition to the recovery of $2,268.64 in compensatory damages.

misrepresentation, the record is devoid of evidence showing those particular elements necessary for an award of punitive damages. *See Price v. Griffin, supra,* 359 A.2d at 589. We note that appellant enjoyed no financial benefit from the settlement agreement. We conclude that the punitive damages award was unjustified. (Footnote omitted).

As the authorities cited in the foregoing excerpt indicate, "[p]unitive or exemplary damages are not a favorite of the law" and therefore should be awarded only in extreme cases. *Price v. Griffin, supra,* 359 A.2d at 589.

In the context of the record in the case now before us, even the final submission to the jury of the claim of punitive damages appears questionable in the light of an earlier ruling at the trial. The only paragraph in the complaint charging the defendant with "malice, ill-will" or in "wrongful disregard of plaintiffs' rights" appears in "Count I—retaliatory eviction," which was based on the hypotheses that the defective condition of the door was a breach of D.C. Housing Reg. § 2506, 14 D.C.M.R. § 705 (1986), and therefore the tenant's objection to paying rent until this condition was corrected was protected against such "retaliatory" action as a landlord-tenant suit by D.C.Code § 45–1562 (1981). Before letting the case go to the jury, the court dismissed this count. No appeal from this ruling was taken. If there was no evidence to support the assertion of retaliatory eviction, it is difficult to find anything else in the case to justify any inference of deliberate malice in defendant's statement or actions.

The court did tell the jury that the "malice ... may be proven by circumstantial evidence, that is, it may be inferred from the acts of the defendant or by direct evidence and that is, it may be proven by statements either written or oral made by the defendant." Here the only written statement in evidence was appellant's letter to Postell informing him that the rent deduction was unacceptable and objecting to the lock he had placed on the door. As to any oral statement, no testimony was offered by the plaintiffs describing in any detail what Queen actually said in the crucial telephone conversation. All that the jury learned about it was provided when Rowell was on the stand:

Q. Okay, when you placed the call to Mrs. Queen, who picked up the phone?

A. I believe Mrs. Queen answered the phone.

Q. Okay. What did you say to her?

A. I called and I told her that I would pay the difference of $77.63. Even though I didn't agree with it, I would go on and pay it because I just didn't want to be bothered with having, you know, having to keep the issue going.

Q. What, if any, conversation did you have with her about when that amount would be paid?

A. I told Mrs. Queen that—I asked her would it be okay if I paid the $77.00 when I paid the first of August rent. I even told her I would send her two separate money orders so that she would know which one—which is for which. I asked her was that okay and she told me, yes.

Q. Okay. Now, did you say anything further to her to ascertain whether she was positive this was okay?

A. I asked her was this arrangement okay, and she told me, yes. So, I felt assured that the arrangement was all right.

While it was rather improbable that the telephone exchange between the two ladies was as succinct as the witness' account of it, it is apparent that what the plaintiffs wished the jury to believe was that Queen merely answered "yes" to the two questions put to her. There was no testimony that Queen expressly alluded to the lawsuit or said anything about what procedure she proposed to take to relieve the tenants from having to appear in court—an omission obviously inconsistent with any calculated scheme on Queen's part to bring about an uncontested judgment. Moreover, if Queen had such a plan in mind, it

would seem unlikely for her to have waited for the opposing parties to call rather than approaching them herself.

The only other act on the part of the defendant which was left for the jury to consider was her failure to honor the settlement by letting the eviction proceed. As we have already noted, however, the jury was told such failure was enough to arrive at a conclusion of wrongful eviction—an instruction the court overlooked when it denied the motion for judgment n.o.v. in its entirety in a memorandum saying that "the defendant's default judgment was obtained fraudulently." See note 6, *supra*.

Conceivably such failure may have been due to carelessness, forgetfulness or lack of authority.[9] While such reasons would not excuse a violation of the settlement agreement, all that the plaintiffs proved was that there was such an agreement and that it was breached. Such proof falls far short of establishing malicious, willful, or wanton misconduct. Accordingly, we must remand the judgment to the trial court for the entry of an order deleting any recovery of punitive damages.

*Affirmed in part, reversed in part.*

[9]. Appellant was the agent not the owner of the premises involved in the landlord-tenant action. She testified that the owner had instructed her, after this action was commenced, to serve a notice to vacate based upon such breaches of the lease as keeping a pet and annoying other tenants by noisy quarrels. According to appellees' counsel at oral argument, such a notice was prepared, but was not delivered to them.