**Oliver E. CURRY, et al., Appellants,**

v.

**GIANT FOOD COMPANY OF THE DISTRICT OF COLUMBIA, et al., Appellees.**

**No. 83–460.**

District of Columbia Court of Appeals.

Submitted June 7, 1984.
Decided March 30, 1987.

*United States,* 113 U.S.App.D.C. 126, 306 F.2d 286 (1962) (construing federal statute).

Robert Cadeaux, Washington, D.C., for appellants.

Edward J. Lopata, with whom David P. Durbin and Kathy S. Tyson, Washington, D.C., were on the brief, for appellees.

William Carter, Washington, D.C., also filed an appearance.

Before FERREN and TERRY, Associate Judges, and REILLY, Senior Judge.

REILLY, Senior Judge:

This is an appeal from a judgment for the defendants in an action brought by Oliver Curry (appellant) in which he sought to recover damages from Giant Food and four of its security personnel for what he asserted was an unlawful arrest and assault for attempted shoplifting. According to his three-count complaint, the conduct of the individual defendants, *viz.*, Shirley Cumberlander, Karl DeVaughn, Alexander Belton, and Louis Moses, and their employer, amounted to the commission of three distinct wrongful acts: (1) assault and battery, (2) slander, and (3) false arrest and imprisonment. Curry's action was joined by his wife, who claimed damages for loss of consortium.

After a five-day trial, the court directed verdicts for the defendants on the allegations of slander and loss of consortium. In a series of special verdicts, the jury found for the defendants, except Belton on the assault and battery charges. On the battery count, appellant was awarded $1,800 in compensatory damages (the judgment entered this sum against the corporate defendant) and one dollar in punitive damages against defendant Belton. None of the parties has appealed the judgment against Giant on the battery count, but appellant has assigned as error not only the directed verdicts, but a number of evidentiary rulings and instructions.[1] We perceive no error and affirm.

Evidence as to what actually happened in the store is in sharp conflict. What is not in dispute is the fact that appellant, a man in late middle age (he was 58 at the time), entered a large retail outlet of the Giant Food Company located at 8th & P Streets, N.W., to have a medical prescription filled in the pharmacy section in the rear of the

---

1. Appellant also appealed the judgment against Belton, arguing that an exclusionary ruling of the court discouraged the jury from awarding substantial punitive damages.

store, which has a separate cashier's desk. After receiving his medicine and paying for it, he then went into the grocery section of the store which occupies the bulk of the floor space and emerged from one of the lines where cashiers were checking out grocery shoppers. Before he could leave the store, he was stopped by a uniformed security guard, defendant Moses, who ushered him to a room in the back of the premises. When appellant protested, the guard told him he was "wanted in back" because he had stolen something.

The reason the guard had detained him was that he had received a radio report two or three minutes earlier from another security employee, defendant Shirley Cumberlander, who had been surveying the grocery customers from the rear of the store. The message was that she had spotted a man (whose attire she described) approach the meat counter and tuck a two pound roast under his jacket. Appellant matched this description. Receiving another radio signal, the guard then stopped him.

From this point on, the testimony is conflicting. According to Moses, when he was escorting appellant to the back of the store, the latter flipped a slab of beef to the floor as they were passing the meat counter, where it was retrieved by one of the butchers.[2] After this happened, Moses took appellant through another door, and left him in the security office, a room partitioned from the customer area, with a small entrance corridor.

Cumberlander's testimony was that when appellant was brought to the office, she tried to question him after reading him "his rights." Appellant became furious and threatened her. Hearing this angry exchange, two other defendants, DeVaughn, the security supervisor, and Belton, another security officer, came into the office. Cumberlander left and telephoned the police. According to the two other defendants, they attempted to search the detainee, but the latter lunged at DeVaughn, who then grappled with him. In

an effort to break up the struggle, Belton testified that he slapped appellant once with his nightstick, hitting his right knee. Appellant then resumed his seat. After propounding some questions, the security officers presented appellant with a release form. He refused to sign it. Soon thereafter, police officers arrived, and after hearing an account of the incident, placed appellant under arrest and took him to the police station. He was eventually arraigned and formally charged with shoplifting. A subsequent trial resulted in appellant's acquittal.

Appellant's version of the events in the detention room was quite different. He testified that without any provocation, the security officers had beaten him. He said that Belton had used his weapon not only to strike him on the knee, but had also hit him repeatedly on other parts of his body, bruising his face, breaking his teeth. He told the jury that after he had left the pharmacy section of the store, he proceeded immediately toward the front door, not pausing at any of the grocery counters or shelves on his way there. He also testified that when the guard stopped him at the front of the store and ordered appellant to accompany him to the rear, that the guard's explanation—that he had stolen something—was uttered within hearing of nearby customers.

I

As this summary indicates, the outcome of the case depended largely upon how the jury resolved the credibility of the witnesses. Appellant, disappointed with the verdict of the jury and the small amount of damages awarded him, contends that the trial court committed no fewer than twelve errors.

For purposes of review, we have grouped these objections as being directed at five categories of rulings, *viz.*, (1) instructions on law of liability, (2) refusals to grant mistrial, (3) exclusions of evidence, (4) directions bearing on measure of damages,

---

**2.** Although appellant on the stand denied having ever picked up any groceries, this portion of Moses' testimony was corroborated by the butcher who brought this item to the office where appellant was being questioned.

and (5) directed verdicts, and shall consider these seriatim.

### 1. *Instructions on Right to Arrest and Detain.*

Appellant contends that the trial court improperly charged the jury on liability for false arrest/false imprisonment,[3] claiming the following instruction was erroneous:

> In this regard, I instruct you that defendant Cumberlander is not liable for false arrest and imprisonment with respect to the initial detention *simply* because you find she was in fact, *mistaken* about the plaintiff. (Emphasis added.)

Appellant asserts that the "simply ... mistaken" language of the instruction does not accurately charge the jury on the law which requires that the arresting officer possesses a good faith and reasonable belief that his conduct is lawful. See *Henderson v. District of Columbia,* 493 A.2d 982, 994 (D.C.1985) (citing *Wade v. District of Columbia,* 310 A.2d 857, 862–63 (D.C.1973)).[4]

Since 1884 this jurisdiction has adhered to the rule that "the court must look at the whole charge, and if they see that, in the very next paragraph, an apparent error in one part is corrected, then no injury on the whole is done" and the exception will not be sustained. *Carpenter v. Washington &* *Georgetown R.R. Co.,* 14 D.C. (3 Mackey) 225, 228, *aff'd,* 121 U.S. 474, 7 S.Ct. 1002, 30 L.Ed. 1015 (1884). *See also Airlie Foundation, Inc. v. Evening Star Newspaper Co.,* 337 F.Supp. 421 (1972).

■ In the instant case, immediately following the statement to which appellant takes exception, the court stated to the jury:

> [A]s long as you find that she believed in *good faith* that the plaintiff had committed or was about to commit a crime, and if you find that the belief was *reasonable.* (Emphasis added.)

Taken as a whole, these two statements unequivocally instructed the jury that liability could be based only upon a finding of lack of good faith and reasonable belief. The words "simply ... mistaken" in the instruction was merely an elaboration by the trial court upon the test. The court's charge did not instruct the jury to impose a lesser standard than good faith and reasonable belief. Thus, a fair reading of the full text of the court's instructions shows no error.

Appellant also claims error in the instruction that defendants were legally entitled to continue to keep Curry in custody unless they knew or were convinced beyond a reasonable doubt that further detention was unwarranted.[5] He argues that the

---

3. In *Shaw v. May Department Stores Co.,* 268 A.2d 607, 609 n. 2 (D.C.1970), this court concluded that there is no practical distinction between false arrest and false imprisonment. Accordingly, we review appellant's claim without differentiating these theories of recovery.

4. *See also* Standardized Civil Jury Instructions for the District of Columbia, No. 18–3 (1981), which reads:

> A police officer has sufficient legal justification to arrest a person when he reasonably believes, in good faith, that the person (has committed) (is committing) (is about to commit) a crime. Thus, in this case, if you find that Officer _____ had reason to believe and honestly did believe that the plaintiff (had committed) (was committing) (was about to commit) the crime of (see D.C.Code § _____), then Officer _____ had sufficient legal justification to arrest the plaintiff.

5. The text of the instruction on this point is as follows:

> If you find that the initial detention of the plaintiff was lawful and thus find Defendant Cumberlander is not liable for false arrest and imprisonment with regard to the initial detention of the plaintiff at the front of the store, then the next question for you to determine is whether the Defendants Cumberlander, DeVaughn, and Belton are nevertheless liable for false imprisonment with respect to the subsequent detention of the plaintiff in the security room in the back.
>
> In this regard I instruct you that if you find that the plaintiff's initial detention in the front of the store was lawful, then the defendants were justified in further detaining the plaintiff for a reasonable time for the purpose of delivering the plaintiff into the custody of the Metropolitan Police Department. Thus, if you find that plaintiff's initial detention was legally justified, then Defendants Cumberlander, Belton, and DeVaughn were legally entitled to continue to maintain the plaintiff in their custody *unless you find that while the plaintiff remained in their custody one or more of the*

same good faith and reasonable belief standard used to determine the validity of the initial detention should control in challenges to continued detention.

At the outset, we note that there is no standard civil jury instruction regarding continued detention in false arrest claims. The source of the portion of the instruction to which appellant takes exception is RE-STATEMENT (SECOND) OF TORTS, § 134 comment f (1965), which provides:

> f. *Actor's duty to release other.* If the actor, whether a private person or a police officer, has arrested another without a warrant ... and has *ascertained beyond a reasonable doubt that the suspicion upon which the privilege to arrest is based is unfounded,* he is no longer privileged to keep the other in custody and must release him, unless the other indicates his desire to be taken before a court, body, or official, in order that the stigma which the other believes that the arrest has put upon him may be officially removed, or unless the other objects to his release in the belief that it will endanger his bodily security or entail expense. (Emphasis added.)

 In our opinion, this provision of the RESTATEMENT correctly sets forth the standards to be applied when the lawfulness of an arrest and detention is disputed. As we have found no holding in this jurisdiction to the contrary, we deem this instruction a proper guideline for a jury to follow.

### 2. *Rejection of Mistrial Motions.*

Appellant maintains that the trial court committed error in failing to declare a mistrial on two separate occasions during the course of the trial. It is well settled that the question of whether or not to declare a mistrial rests within the sound discretion of the trial court and that ordinarily the prejudicial effect of improper evidence or statement by counsel can be cured by a cautionary instruction. *Jacobs v. H.L. Rust Co.,* 353 A.2d 6, 7–8 (D.C.1976).

 In the trial here, appellant moved the court to declare a mistrial after opposing counsel asked a police witness whether the February 26th incident had resulted in any criminal charges of shoplifting against Curry, the appellant. The court denied this motion and *sua sponte* cautioned the jury against drawing any adverse inference from the question,[6] in words which plainly remedied any prejudice that might have resulted from the unanswered question. Where a court instructs a jury to disregard a question, it cannot be assumed that the jury took no heed of the court's direction. *Washington & O.D. Ry. Co. v. Dulany,* 53 App.D.C. 67, 73, 288 F. 421, 427 (1923).

---

defendants asserted—learned beyond a reasonable doubt based upon facts which came to light after the initial detention that the suspicion which had occasioned the plaintiff's initial detention was unfounded. In that event the defendant or defendants who asserted beyond a reasonable doubt that plaintiff's detention was unjustified, had a duty then to release the plaintiff and is—or are liable for false imprisonment for the breach of their duty.

In this connection reasonable doubt is a doubt based on reason, and a doubt for which reason can be given. It's the kind of doubt that would cause a reasonable person to hesitate or pause in more important transactions of life. If, however, you find that the plaintiff's initial detention was unlawful and thus find that Miss Cumberlander is liable for false arrest and imprisonment in the front of the store, then the Defendant Cumberlander is liable as a matter of law for false arrest and imprisonment with respect to the plaintiff's later detention in the security room. However, Defendants Belton and DeVaughn are not liable for the subsequent security room holding *unless you find* that at the time they participated in the plaintiff's continued detention Belton and/or DeVaughn *knew or were convinced beyond a reasonable doubt that the detention of the plaintiff was justified.* (Emphasis added.)

6. The court, having previously ruled that evidence of criminal charges was irrelevant and evidence of subsequent acquittal was inadmissible, instructed the jury as follows:

> THE COURT: Ladies and gentlemen, as I told you at the beginning of the case and as I'll tell you again before we're through, questions aren't evidence. The only evidence is the answer given by a witness. Nevertheless, despite the fact that we don't have an answer, we just had a question, disregard that question, disregard any reference [to] charges being brought. The question of whether charges were brought or not. Put that out of your mind.

■ Appellant also requested, unsuccessfully, a mistrial following defense counsel's summation in which he referred to Curry's prior involvement with "the system." The contention is that counsel's reference was another attempt to stigmatize Curry as a defendant in a criminal prosecution—a matter the trial court had already excluded as inadmissible. This contention was completely unfounded as the court recognized in denying the request. The context of the statement discloses that counsel was referring only to Curry's participation in civil litigation, not criminal trials.[7]

### 3. *Exclusion of Proffered Evidence.*

The assignment of errors includes a series of rulings in which the trial judge refused to allow appellant to offer evidence consisting of (a) a copy of Giant Food's rules and regulations on the conduct of employees concerning the apprehension of shoplifters, (b) testimony intended to show that the training and supervision by Giant of its security personnel was negligent, and (c) prior reprimands to three of the employee-defendants in this case. Appellant argues that evidence of such reprimands would have provided additional proof of its contention that the guards at the Giant store lacked adequate training and supervision.

It is difficult to perceive in the context of the pleadings in this case why such evidence, even if admitted, would have had any relevance whatsoever on the questions upon which the parties had joined issue and thus called upon the jury to decide. Obviously, the purpose of such proffers was to demonstrate that the defendant-employer Giant was liable for the acts of its employees. The authorities cited, including sections of the RESTATEMENT OF AGENCY upon which appellant relies, all deal with litigation in which the defense of the employer (or owner of the premises) is that the acts of the offending employees were outside the scope of their employment, and therefore, the rule of *respondeat superior* was inapplicable. Where this defense is advanced, manuals of instructions to employees are frequently introduced, sometimes to show that the challenged employee actions were forbidden by employer rules, or by a plaintiff, to show the converse. Both *Brown v. Great Atlantic & Pacific Tea Co.*, 275 App.Div. 304, 89 N.Y.S.2d 247 (1949), and *Peak v. W.T. Grant Co.*, 409 S.W.2d 58 (Mo.1966) (en banc), which appellant cites, turned upon principles of agency law.

■ But in the instant case, Giant Food never disclaimed responsibility for the acts of its employees, the individual defendants. In its answer to the complaint, it joined all of them in a common defense, *viz.*, a denial that any defendant had committed unlawful acts, and in the alternative that they had reasonable and proper cause to do and say what they did. At no stage in the trial did Giant attempt to distance itself from the measures undertaken by its personnel in the arrest and forcible detention of appellant.

■ Equally irrelevant to the issues in this case was the effort of appellant to show that Giant's security personnel were negligently trained or supervised. In cases where the offending employees have clearly acted beyond the scope of their authority, *e.g.*, an armed gardener shooting and

---

7. In arguing that Curry's physical ailments were not caused by defendants, counsel pointed to his prior accidents and the physical injuries and monetary settlements resulting therefrom. The following is the challenged comment as reported in the transcript:

And then when Dr. Gladden testified, Dr. Gladden saw him one time. Purpose was to give him a complete physical examination to go over the complaints that Mr. Curry had.... He was completely normal except for the fact that he had arthritis to some extent and a chronic lumbral sacral sprain of the back which he says is not uncommon [in]

anybody who is 57 or 58 years of age because your body changes.

Dr. Gladden is not involved in any conspiracy. He only testified as to what his physical examination showed. Again, why is it Mr. Curry is saying he can't do this, he can't do that? Ladies and gentlemen, we know that Mr. Curry has been involved in the system as far as the court is concerned. We know he's been involved in other law suits. And we got—we have introduced into evidence a praecipe indicating that in the other action he settled the case for $9,000.

wounding a trespasser,[8] or watchmen stealing merchandise from the storeroom of their employer's client,[9] it is of course proper to show in actions where recovery is sought against the employers of the tortfeasors, that when such employers failed to give precautionary instructions or were lax in supervision, they should not be allowed to escape responsibility for the acts of their servants. But where the liability of the principal for the conduct of its agents is not disputed, it was not incumbent upon the trial court to admit evidence ultimately to establish a matter conceded.[10]

Appellant has also taken exception to another exclusionary ruling of the court which sustained objection to the elicitation of testimony concerning Giant's liability insurance policy, contending that such policy might have contained a provision protecting employees of the company from liability for punitive damages.

Appellant concedes that in this jurisdiction it is well established that in actions for personal injury, plaintiffs are not permitted to present evidence to show that a defendant is protected by insurance. *Brooke v. Croson*, 61 App.D.C. 159, 160, 58 F.2d 885, 886 (1932). He argues, however, that in this case he sought the admission of such evidence solely on the question of punitive damages, and consequently, the court should have distinguished the matter from the ordinary rule preventing the disclosure of insurance protection against compensatory damages.

It is true that in cases where punitive damages are sought, testimony with respect to the financial assets of a particular defendant may be received. *King v. Nixon*, 93 U.S.App.D.C. 98, 207 F.2d 41 (1953). The rationale for such holdings is that since the objective of punitive damages is punishment and deterrence, an amount that might inflict substantial financial harm on a person of limited assets would have only a negligible effect upon a person of great wealth. 22 Am.Jur.2d *Damages* § 322 (1964). In the case now before us, the individual defendants were allowed to testify on direct examination that they possessed little or no net worth, and that the debts of one of them (Belton) actually exceeded his assets. Appellant's position is that the admission of such testimony entitled him to show the jury that the financial condition of the witness was not limited to his personal assets but included insurance coverage for substantial punitive damages. This is something of a non sequitur. If the purpose of punitive damages is to impose real punishment upon the tortfeasor, such purpose would plainly not be accomplished if the wrongdoer was relieved of any financial loss by an insurance policy paid for by somebody else.[11] Even when the defendant himself has subscribed to the policy, it has been held in some jurisdictions, that it would defeat public policy to permit such person to shift the burden of punitive damages to an insurance company. *See Northwestern Casualty Co. v. McNulty*, 307 F.2d 432 (5th Cir.1962).[12]

8. *Murphy v. Army Distaff Foundation, Inc.*, 458 A.2d 61 (D.C.1983). The opinion referred with approval to Restatement (Second) of Agency § 213 (1957).

9. *International Distribut. Corp. v. American Dist. Tel. Co.*, 186 U.S.App.D.C. 305, 569 F.2d 136 (1977).

10. In ruling out appellant's proffer of negligent training and supervision, the trial judge held that expert testimony was needed to show what standards were adequate. *See District of Columbia v. White*, 442 A.2d 159 (D.C.1982). In view of our disposition of this issue, we need not pass upon this aspect of the ruling.

11. To support his thesis, appellant relies on an Arizona decision, *Michael v. Cole*, 122 Ariz. 461, 595 P.2d 1006 (1978), disregarding *its* overturn

by the Arizona Supreme Court, *Michael v. Cole*, 122 Ariz. 450, 595 P.2d 995 (1979) (en banc). In reversing an intermediate court of appeals, the state Supreme Court specifically held that an insurance policy is not an asset of the defendant which the plaintiff can introduce into evidence on the issue of punitive damages. We agree.

Appellant also cites dictum in a Kansas case, *Ayers v. Christiansen*, 222 Kan. 225, 564 P.2d 458 (1977), not supported by the weight of authority.

12. This opinion was quoted for this proposition by our court in *Salus Corp. v. Continental Casualty Co.*, 478 A.2d 1067, 1071 (D.C.1984), but was deemed not dispositive of the issue raised.

4. *Measure of Damages.*

Appellant does not argue that the jury award for damages after its verdict in his favor on the assault and battery count was inadequate to cover whatever medical expense and temporary loss of earnings he incurred from any physical injuries resulting from the scuffle in the store. He now contends, however, that the court erred in refusing to allow the jury to consider additional compensatory damages for future lost income.

The evidence shows several years before the fracas in the Giant store, appellant was not regularly employed, but did work about three hours a day as an independent taxi driver. Long prior to this event, he was being treated for arthritis and pain in the knees and back, a condition exacerbated by two accidents which occurred while he was driving—one of them serious enough to enable him to collect damages. There was medical testimony from his physicians that the incident in the Giant store had aggravated his knee and back condition.

■ The record does not indicate that appellant preserved any objection with regard to the removal from jury consideration of the issue of future lost wages. When the court noted that the evidence established no difference between the number of days (or hours) a week, appellant was able to work before and after the incident, his counsel conceded as much.

■ In any event, there was insufficient evidence to warrant submission to the jury of the claim for future lost wages. The rule is that recovery of damages based on future consequences of a tort is available only if such consequences are reasonably certain. Unless there is nonspeculative evidence demonstrating that future suffering, additional medical expense, and loss of income will occur, the question should not be submitted to the jury. *American Marietta Co. v. Griffin,* 203 A.2d 710, 712 (D.C.1964); *accord, Wilson v. Johns-Manville Corp.,* 221 U.S. App. D.C. 337, 345, 684 F.2d 111, 119 (1982).

The court also ruled that appellant was barred from recovering damages in a false arrest action for the time 'that he was in police custody and any time thereafter. Appellant challenges this ruling, arguing that the individual defendants engaged in a course of conduct which instigated Curry's unlawful arrest and imprisonment by the police officers, and consequently, their liability extends through the period of police detention.

Merely giving facts to an officer which shows that an offense has been committed and identifying a particular suspect will not give rise to liability, however, unless it is shown that the informant "directs, requests, invites or encourages the unlawful detention of another." *Smith v. District of Columbia,* 399 A.2d 213, 218 (D.C.1979). Damages for false arrest cannot be predicated upon the fact that one party has told the police that another has committed an offense of a criminal nature, where the decision to arrest remains with the police. *Id.*

Appellant points out, however, that where an accuser acted with malice by providing the police with information he knew to be false, the immunity given accusers by the *Smith* case is inapplicable. Here, appellant contends there was "ample evidence ... that appellees maliciously fabricated a shoplifting scenario and reported it to the police resulting in the arrest of appellant."

The record discloses that the challenged ruling occurred at an early stage of the trial, when the court held that appellant was required to have brought an action for (or specifically alleged) malicious prosecution in order to recover damages for deprivation of liberty while in police custody. Appellant made only a general objection to this ruling, but now contends that since the complaint charged malice with respect to all the acts and words of the security personnel in connection with his arrest and detention, these allegations were sufficient.

■ We need not pass upon this precise issue, for it is clear from the record that the error, if any, was harmless. As we have previously stated, the court did put to the jury the issues of whether the first arrest by the guards was based on good

faith or reasonable belief, and then whether the store personnel persisted in detaining him despite their knowledge that the reasons for the initial stop were unfounded. As the jury returned a verdict for the defendants on both issues—thereby rejecting appellant's allegation that his continued detention was actuated by malice—the contention that the call to the police and the accusation to the officers of attempted larceny exhibited malice is plainly frivolous. Except for appellant's own protestations of innocence—negated by the production of the stolen item—there is nothing in the record to show that any of the defendants had concluded that their original arrest was mistaken, or had any reason for thinking so.[13]

Indeed, appellant's own testimony reveals that far from insisting upon prosecution, the Giant employees—having recovered the stolen item—offered to drop the matter and let him go if he would sign a release form. He refused to sign. He maintained this position, even after one of the arriving police officers intimated that he could avoid prosecution by doing so.

In arguing that the individual defendants were guilty of maliciously fabricating a tale of shoplifting, appellant cites some minor discrepancies in the testimony of the security personnel, focusing primarily upon conflicting recollections of which ones, and how many of them, were either in the security room or the adjacent corridor at certain intervals. None of these variances reveals an elaborate conspiracy to "cover up." Significantly, it is not argued that the butcher, who corroborated the crucial feature of Moses' testimony—the dropping of the concealed meat packet—was a party to the alleged fabrication.

Appellant also sought damages to compensate him for overuse of alcohol. According to his testimony, he was once a moderate drinker, but since his detention at the Giant store, he regularly drinks to excess. On the witness stand, both he and members of his family depict him as having become something of a domestic recluse—rejecting the company of his grandchildren and his brother, ceasing sexual relations with his wife and depriving her of his companionship and affection.

As most laypersons would not regard the acquisition of an alcoholic habit as an ordinary and foreseeable consequence of an arrest and forcible detention, appellant tried to establish causation through expert medical testimony. He called to the stand the physician who had been treating him for arthritis, back and leg pains, for an opinion attributing the cause of increased resort to the bottle to this incident. After examining the witness on voir dire, the trial court refused to allow him to testify before the jury on this point.

In our opinion, the exclusion of the proffered testimony was not error, but was fully supported by our decision in *Dyas v. United States*, 376 A.2d 827, *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977), which sets forth three inquiries a trial court should make before determining the admissibility of expert testimony, *viz.*: (1) is the subject matter so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman; (2) does the witness have sufficient skill, knowledge or experience in that field so that his opinion will aid the trier of fact in its search for truth; and (3) does the state of scientific knowledge permit a reasonable opinion to be ascertained by means of a methodology generally accepted by other experts in the field? *Id.* at 832.

■ The record reflects that the trial judge applied the *Dyas* three-part test. Under the first criterion, the court found

---

13. It was not until after appellant's release from custody that the possibility that the security personnel had arrested the wrong man was ever suggested. Appellant's theory of mistaken identity rests on testimony that his brother, who was similarly dressed that day, had arrived at the store with him, went directly to the meat counter, purchased a piece of beef, and departed while appellant was still in the pharmacy section. Accordingly, the hypothesis is advanced that the brother, not appellant, was the customer first spotted by Cumberlander, and that she confused him with the man she saw two or three minutes later beside one of the grocery cash registers, thereby causing Moses to stop him.

that expert testimony was clearly needed to link the events at the Giant store with Curry's increased consumption of alcohol. Applying the second, after the witness told the court that psychiatric study could show the cause, the court noted that the witness did not qualify as an expert in the field of psychiatry as he had only one year of psychiatric training forty years ago. It is unnecessary to review the correctness of the court's view on this point, for the transcript shows that its ultimate ruling was correct because the third prong of the *Dyas* test was not met. The witness failed to demonstrate that a generally accepted methodology exists for relating an increase in alcoholic consumption to a particular occurrence. In fact, in attempting to explain the methodology, the witness at one point seemed to rely upon the notion that if some phenomenon occurs after the happening of a particular event, this is a ground for deducing cause and effect—a classic example of *post hoc, ergo propter hoc* kind of reasoning.[14]

## II

### Directed Verdicts

The joint appeal also challenges directed verdicts for all defendants on (a) the wife's action for loss of consortium, and (b) appellant's allegations of slander.

The evidence submitted to prove loss of consortium was virtually the same as that presented in connection with appellant's excessive use of alcohol which has been summarized *supra* in our review of the trial court's disposition of this issue. The court in granting a motion for a directed verdict against Mrs. Curry noted an absence of evidence establishing proximate cause between such loss and any of the acts attributable to any of the defendants. The court also pointed out that plaintiff had made no satisfactory allocation of liability among the various tortfeasors. While this latter comment which implies a requirement for apportioning liability among tortfeasors may be questionable, *see Bowman v. Redding*, 145 U.S.App.D.C. 294, 305, 449 F.2d 956, 967 (1971), we need not review it in the light of the special jury verdicts on the other issues, which cleared all the individual defendants, except Belton, of the allegations of tortious conduct. Thus, the question of apportionment is academic. In the present posture of the case, there was only one individual tortfeasor, Belton. Although he had participated in the arrest and detention, the only act of his the jury found wrongful was his use of force to subdue appellant when the latter was grappling with another defendant. The jury concluded that this amounted to battery.

In its special verdict the jury found for DeVaughn on the same battery count, and also found that neither Belton nor any other defendant had inflicted any dental injury upon appellant. Thus, under the jury's findings the only physical damage caused by tortious conduct was a knee injury of a temporary character.

■ It is true of course, as co-appellants point out in their brief, that in this

---

**14.** The following excerpt from the voir dire is illuminating:

THE COURT: Do you have a methodology that enables you to tell, if a person is sixty years old and they've had a life that's lasted sixty years, and on August 8, three years ago there is an event that happens to them and then the next day there is another event that happens to them, and then the next day another event. Okay. Are you able to look back on the person's life, having been a patient of yours, and say whether or not there is a cause and effect relationship between what happened on August the 8th, August 9th and August 10th and the person becoming an alcoholic or abusing alcohol?

Are you able? If you are, what's the methodology that you use to do that?

THE WITNESS: The methodology there would be past history.

THE COURT: What do you mean by that, sir?

THE WITNESS: Well, I mean whether the extent they used alcohol before this particular point, critical point you mentioned.

THE COURT: So, if they used more afterwards, then you'd say it's caused by that?

THE WITNESS: Not exactly.

It's the length of time, say, in other words, this is what I'm trying to explain. Whether they continue and increased it, and continue, and you couldn't stop them from using it. In other words, this is whether the critical phase, at the time they turned to using more alcohol, was continued to a greater extent and then continued on and on and on and on.

jurisdiction, a wife may recover damages for loss of consortium due to an injury negligently inflicted upon her husband and that the term "consortium" consists not only of material services, but also affection, companionship, sexual relations, and the customary amenities of married life. *Hitaffer v. Argonne Co.,* 87 U.S.App.D.C. 57, 183 F.2d 811, *cert. denied,* 340 U.S. 852, 71 S.Ct. 80, 95 L.Ed. 624 (1950). *See also Albert v. McGrath,* 107 U.S.App.D.C. 336, 278 F.2d 16 (1960) (suit for alienation of affections). This does not mean, however, that a wife may recover for deprivation of certain aspects of "consortium" unrelated to the particular injury caused by the tortfeasor.

According to appellant's testimony, his knee injury was so painful that he stayed in bed the following day, called a doctor to lance the swelling, and was unable to resume taxi driving until a few weeks later. As previously noted, however, appellant does not argue that the $1,800 verdict returned by the jury fell short of compensating him for the medical expense and loss of earnings he incurred in this period.

Obviously, whatever loss of consortium can be attributed to this injury was *de minimis.* No evidence was offered of hospitalization or of any physical incapacity to engage in normal marital relations.

■ The brief of co-appellants reveals that what they regard as error was the refusal of the trial court to submit to the jury as an item of damages the deprivation suffered by the wife resulting from a change in her husband's emotional attitude toward her, manifesting itself by a "drinking problem," cessation of sexual relations, solitary brooding, bad temper, sleeplessness, disinterest in conversation, or going out together to sports events. While there is no doubt that such behavior did amount to a loss of consortium, no evidence was offered to show that such abnormal conduct was caused by the blow to the knee— the only act of the defendants deemed tortious by the jury.[15] Consequently, we dis-

cern no error in the challenged ruling of the court.

There is no basis in the record to sustain appellant's contention that the court erred in directing a verdict for all defendants on the slander count. It is true that an oral accusation of the commission of a crime, if uttered in the presence of third parties, is slanderous per se, unless the statement is "qualifiedly privileged." *Smith v. District of Columbia, supra,* 399 A.2d at 220. Such privileged statement is not actionable in the absence of a showing of excessive publication or express malice. *Id.* at 221; *Thomas v. Howard,* 168 A.2d 908 (D.C. 1961).

In this case, the only accusatory statement publicized, in contradistinction to communicating among security and police personnel, occurred when Moses stopped appellant and told him he was "wanted in back" for stealing—a remark overheard by some of the store customers. As appellant's own testimony conceded that this statement was prompted by appellant's demand for an explanation, the court ruled that the circumstances demonstrated neither malice nor excessive publication. This ruling is not challenged on appeal.

Appellant does argue that the court erred in not letting the jury decide whether or not statements of two other defendants amounted to slander, particularly (1) Cumberlander's radio message to Moses that the individual nearing the cash register had picked up and concealed a packet of beef, and (2) DeVaughn's oral report to the city police officers indicating that he had seen appellant dropping the packet.

With respect to these defendants, the trial court found that as security guards, they were officially concerned with, and accountable for, the detection of criminal activity in the store, as well as the apprehension of those believed to be responsible. Thus, the court found that any communication made by the guards, either amongst themselves or to the police, regarding suspected wrongdoing was qualifiedly privi-

---

**15.** The items of behavior described by the witnesses could well be ascribed to excessive drinking, but, as previously noted, the asserted causa-

tive connection between this habit and the tortious conduct of the security personnel was not demonstrated by competent evidence.

leged. *See Smith v. District of Columbia, supra,* 399 A.2d at 221.

Appellant's position is that while statements of security guards to police officers are ordinarily privileged, these statements did not fall into that category because they were actuated by malice. As proof of malice, however, appellant points only to certain discrepancies in the testimony of the witnesses respecting the details of what transpired after the arrest in the store. None of the witnesses contradicted one another, however, on any pertinent matter. In fact, appellant's brief seems to concede as much by contending that "[t]he contradictory nature of the stories coupled with appellant's theory of mistaken identity, was sufficient to permit the theory of slander to go to the jury...."

Plainly, if the challenged statements of defendants were due to a mistake, it would scarcely be consistent to regard them as malicious. This court has held that a mere characterization of certain conduct as malicious does not create a question for a jury to consider in the absence of evidence of actual malice. *Queen v. Postell,* 513 A.2d 812, 816 (D.C.1986). Hence, the directed verdicts here on all the slander allegations were correct.

*Affirmed.*